[No. 660-2. Division Two. December 13, 1972.]

EARL W. JACKSON, *as Administrator, Appellant,* v. STANDARD OIL COMPANY OF CALIFORNIA *et al., Respondents.*

*Hugh Miracle* (of *Miracle & Pruzan*), for appellant.

*R. DeWitt Jones* (of *Jones, Read & Church*), for respondents.

PEARSON, J.—This is a wrongful death action brought by the personal representative of Norman Zumwalt, deceased. Mr. Zumwalt, a welder by trade, was killed when an empty fuel storage tank exploded as he commenced to repair a hole by welding.

The action was commenced against (1) Standard Oil Company of California, the manufacturer and seller of certain petroleum products which had previously been delivered into the storage tank in question; (2) Jay Brockway, who held a wholesale distributor's contract with Standard, under which contract the petroleum products in question were delivered; (3) Austin Skordahl, who together with Jay Brockway jointly owned and operated Triangle Distributing Company, a Washington corporation which had been formed by Brockway and Skordahl to carry out the distributorship contract with Standard Oil; and (4) Gary Skordahl, a part-time truck driver and employee of Triangle, who allegedly made delivery of adulterated petroleum products to the buyer, Washington State Department of

Natural Resources (DNR). (Neither Triangle nor DNR were defendants.)

At the conclusion of plaintiff's case in chief, the trial court sustained Standard's challenge to the sufficiency of the evidence and informed the jury that Standard was no longer a party defendant. The court ordered the trial to proceed against the remaining defendants. Shortly after the remaining defendants commenced presenting their evidence, plaintiff sought to reargue against the dismissal of Standard Oil. When the court declined to change its previous ruling, plaintiff then sought a voluntary nonsuit without prejudice against the remaining defendants, so that an appeal could be taken as to the propriety of Standard's dismissal.

The trial court denied the motion for voluntary nonsuit. Plaintiff's counsel then advised the court that he would not proceed with the case in its present posture, and left the courtroom. Subsequently, the court granted the motion of the remaining defendants for a dismissal with prejudice on the ground that plaintiff had abandoned his action against them.

Plaintiff appeals from the order of dismissal against Standard Oil, as well as the order of dismissal entered in his action against the other defendants. We reverse the former order, but affirm the latter. We turn first to the order of dismissal as to Standard Oil Company.

A challenge to the sufficiency of the evidence admits the truth of plaintiff's evidence and requires that it be viewed in a light most favorable to him. Likewise, plaintiff is entitled to the benefit of all reasonable inferences from his testimony. *Heasley v. Riblet Tramway Co.*, 68 Wn.2d 927, 416 P.2d 331 (1966). We now consider the testimony in that light, to see whether or not substantial evidence was presented in support of plaintiff's claim. *Hall v. Puget Sound Bridge & Dry Dock Co.*, 66 Wn.2d 442, 403 P.2d 41 (1965).

Norman Zumwalt was killed on March 6, 1970 by the explosion of an empty diesel oil storage tank, when he

began to repair a hole by welding. At the time of his death, Mr. Zumwalt was employed by Superior Welding, a firm that had performed miscellaneous welding services over the years for DNR. The tank in question had been acquired by DNR in February, 1970[1] and a coworker of Mr. Zumwalt had welded on the tank in late February, shortly after its purchase. The tank had then remained empty until March 5, 1970, when Gary Skordahl pumped 162 gallons of a petroleum product, purportedly pure, unadulterated diesel oil No. 2, into the tank. During this delivery, Gary Skordahl discovered a leak in the tank and terminated the delivery.[2]

Personnel at DNR drained the tank empty that evening and the next day turned the tank on end to drain any residue and took it to Superior to have the hole repaired. Zumwalt learned from these men that the tank had been empty since it had been worked on at Superior a week or so earlier, except for the diesel oil delivery on the day before. The tank exploded when Zumwalt "struck an arc" in the vicinity of the hole. There was testimony from which it could be inferred that Zumwalt acted reasonably under the circumstances and with his knowledge of what had been in the tank.

Chemical analysis of the product delivered by Gary Skordahl indicated that the product was diesel oil contaminated by about 7 percent gasoline. There was testimony by experts that this contamination could have been discovered only by laboratory analysis. From the testimony of all those who handled this particular product, the experts' conclusion was tragically corroborated. To these laymen, the product looked, smelled, tasted and even ran diesel engines just the same as pure diesel oil. Plaintiff's experts also testified that the fumes of pure diesel oil No. 2 would not have exploded under the conditions existing at the time of

---

[1]The tank had been purchased from Triangle Distributing Company and was a used tank when bought.

[2]The leak in the tank was in no way connected with the prior welding services provided by the deceased's employer.

the accident, whereas the adulterated product would explode and was just as dangerous as pure gasoline.

While Standard manufactured the petroleum products in question, plaintiff produced no evidence that the adulteration took place during the refining or manufacturing process. There is also no evidence that Standard's products stored in its bulk facility at Vancouver, from which the product in question came, were contaminated.

The testimony did establish that the tank truck used to deliver the products was owned by Triangle. It had been used the day before this occasion by Austin Skordahl to deliver *gasoline* to another customer. Moreover, the pump and reel hose that was installed on and part of the tank truck's equipment had been used to make that delivery. The jury could find from the evidence that this pump and reel hose contained between 8 and 9 gallons of pure gasoline at the time the storage tank was partially filled by Gary Skordahl on March 5, 1970.

Neither Austin Skordahl, who used the truck the day before, nor Gary Skordahl, who made the delivery to DNR, drained this gasoline. Consequently, when Gary Skordahl hooked up the hose and began pumping "diesel oil," he inadvertently commingled the diesel oil in the tank truck's storage compartment with the gasoline in the tank truck's delivery hose, as he filled the storage tank.

There was also evidence that the storage compartments in the trucks used to deliver petroleum products from the Vancouver facility to Standard's customers were not purged between deliveries of dissimilar products. Thus, when Gary loaded the truck at the bulk facility, the storage compartment already contained some, albeit very little, gasoline from the previous day's delivery.

The plaintiff's evidence showed that Gary Skordahl was unaware of the dangers inherent in commingling a small percentage of gasoline with diesel oil. The evidence also established that prevention of adulteration of the various oil products was a major concern of Standard. In fact, the wholesale distributor agreement between Standard and Jay

Brockway contained the specific provision, "Distributor shall not adulterate such petroleum products, nor substitute for them any other products." Standard also provided its distributors with a "Marketing Operating Manual," which detailed safe handling techniques.

The "Foreword" to this manual contains the following instructions:

> There are two main phases in the conduct of the business of a bulk oil plant. These are SELLING and—to sum up in one word all of the other functions incidental to the complete sale of our products—OPERATING. Operating includes the ordering, receiving, handling, storing and delivering of products and the protection, care and upkeep of plant and equipment.
>
> . . .
>
> *Improper procedures in the receiving and handling of bulk products may cause costly and sometimes dangerous product mixtures and spills, again resulting in possible loss of business, injury to persons or property, or otherwise unnecessary expense.*
>
> *The Company looks to each Wholesale Distributor and employee to assist in the protection of its property and in maintaining it in safe, efficient and presentable condition.*
>
> . . .
>
> *For these reasons it is expected that every Marketing Department Employee, and every Wholesale Distributor and his employees engaged in work involving plant and delivery operations, thoroughly study and familiarize himself with the instructions herein.*
>
> . . .
>
> *Each Wholesale Distributor and employee responsible for or engaged in bulk plant and/or product delivery operations will, upon completing his study of this book, fill out and sign one of the slips provided in the back of the book, handing this slip to his District Sales Manager or the Supervisor to whom he reports, who will mail it to the Regional Office where it will be retained.*

(Italics ours.) None of the individual defendants had ever signed the "slip" provided.

In section 4 of the manual, the prevention of product mixtures is discussed more thoroughly and preparatory to the specific instructions the manual advises:

At every stage of manufacturing, our products are subjected to physical and chemical tests to ensure that products shipped from the refinery conform to exacting specifications. Similar diligence is exercised in the transportation of these products to bulk plants.

It is important, therefore, that Marketing personnel continue the efforts of maintaining product quality to see that clean and uncontaminated products are delivered to our customers.

Following the specific safety practices to be followed, the manual states:

*All* product mixtures, wherever they occur, must be promptly reported to Regional Management, with final disposition made by Manager-Marketing Operations. The nearest Traffic and Distribution Department office should also be notified when product mixtures involve commercial carriers.

(Italics in original.)

The manual requires that tank truck compartments be purged before refilling with a dissimilar product and requires that the installed reel hose and pump on the tank truck be drained before pumping a product different from that of a previous delivery.

It should also be noted that while the distributor was responsible for delivering the products, Standard was, in effect, the "seller" thereof, under the distributorship agreement, and dealt with the customers (DNR) directly in the financial part of the transaction. Ownership of the petroleum products was never in the distributor and an immediate buyer-seller relationship existed between Standard and DNR.

Plaintiff's theories of Standard's liability are threefold: (1) vicarious liability in negligence under the doctrine of respondeat superior; (2) breach of a nondelegable duty as enunciated in section 416, Restatement (Second) of Torts (1965)[3]; and (3) strict products liability, as enunciated in section 402A, Restatement (Second) of Torts at page 347 (1965).

---

[3]Section 416, Restatement (Second) of Torts at page 395 (1965) provides: "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a

We note initially that the two theories grounded in negligence are independent and offer an alternative to the strict tort liability theory. *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969). It is also clear that plaintiff established a prima facie case of negligence against Gary Skordahl on account of his failure to follow approved safety practices in handling the diesel oil delivery and in allowing the diesel oil to become adulterated by highly inflammable gasoline.

The legal issues become more apparent when we consider Standard's response to plaintiff's theories. Standard argues first that respondeat superior is inapplicable because Jay Brockway was an independent contractor and because Triangle Distributing Company, for whom Gary Skordahl worked, is also an independent contractor hired by Jay Brockway to make the actual customer deliveries.

With respect to the nondelegable duty theory, Standard responds that the transportation of petroleum products, including gasoline, is not an ultrahazardous activity when recognized safety procedures are followed; and that it may properly employ independent contractors to transport its products, delegating to them the duty to use reasonable care and comply with well-recognized oil safety practices.

Finally, Standard argues that it cannot be held strictly liable for the condition of its product because (1) the product was not defective; (2) even if it were, the defect occurred after the product left its hands and arose from an act or omission of an independent contractor whose actions Standard could not control; and (3) deceased was not a "user" or "consumer" of its product nor a member of the general public within the class of protected "bystanders."

■ 1. *Vicarious Liability Theory.* We recently considered the requirements for imposing vicarious liability under the doctrine of respondeat superior. *McLean v. St.*

peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

*Regis Paper Co.,* 6 Wn. App. 727, 496 P.2d 571 (1972). We concluded in *McLean* at page 732:

> that the label "employee," or "agent" does not per se create vicarious tort liability. Vicarious tort liability arises only where one engaging another to achieve a result controls or has the right to control the details of the latter's physical movements.

Moreover, we recognized in *McLean* that usually the question of control or right to control is one of fact for the jury.

It should be evident as a refinement of that rule that plaintiff need not show that Standard controlled or had the right to control every aspect of the wholesale distributor's operation in order to incur vicarious liability for certain of the acts of the distributor. It should be sufficient that plaintiff present substantial evidence of Standard's control or right of control over those activities from whence the actionable negligence flowed. If the rule were otherwise, then a person wishing to accomplish a certain result through another could declare the other to be an independent contractor generally, and yet retain control over a particularly hazardous part of the undertaking without incurring liability for acts arising out of that part. Such a result would effectively thwart the purpose of the rule of vicarious liability.

Viewing the evidence in a light most favorable to plaintiff, we believe plaintiff established prima facie, that Standard controlled or had the right to control the training of the distributor's employees in the safe handling of its products. It supervised *that part* of the distributorship to an extent sufficient to incur vicarious responsibility for negligence arising therefrom. We emphasize that we do not hold that control or right to control was established as a matter of law—only that a factual issue was presented for determination by the jury.[4]

The evidence, we think, which dictates this holding came

---

[4] It is conceivable that the jury would find that Standard only retained the right to inspect and supervise, to insure proper completion of the contract, which would not vitiate the independent contractor relationship. *Epperly v. Seattle,* 65 Wn.2d 777, 399 P.2d 591 (1965).

primarily from Standard's "Marketing Operating Manual," the supervision of training provided for in the manual, and the supervision actually carried out by Standard's employees.

The manual contains explicit instructions on many aspects of Standard's bulk plant operations. It is filled with basic oil safety practices which should be followed, as well as detailed procedures obviously peculiar to the Standard Oil Company. While Mr. Brockway testified that the manual was only a "guide" which he could follow or not as he saw fit, a Standard executive testified that the manual was incorporated by reference into the wholesale distributor agreement. The fair import of this testimony is that the distributor was contractually bound to follow the manual procedures.

The foreword to the manual contains explicit directions that each distributor must thoroughly familiarize himself with the contents and sign a statement that the procedures were understood. Moreover, the foreword explicitly states, "Points not entirely clear may then be clarified by a further review of the text *and by a discussion with the District Sales Manager, Foreman, Plant Sales Supervisor, or other experienced associate.*" (Italics ours.)

These provisions furnish evidence that Standard actually undertook or controlled the training of personnel employed to deliver its products to its customers. If, as the evidence disclosed, Standard's wholesale distributor failed to adequately train Gary Skordahl in basic oil safety procedures, then we think Standard must answer vicariously for that omission.

There is another provision in the foreword to the manual which bears on the question of control when considered in light of the fact that Standard never relinquished ownership of the products which it engaged the distributor to deliver. That provision required the distributor and employees to *"assist in the protection of its [Standard's] property and in maintaining it in safe, efficient and presentable condition."* (Italics ours.) In the same vein is a provision in

the basic distributor's agreement that distributor would "conduct said operations in a manner best suited for the preservation of Company's property of whatever kind and nature, the furtherance of the sale of Company's products and the promotion of public good will towards the Company and its products in said district." We also point out that the distributor carried out the operation largely in Standard's name. These factors all evidence an intention by Standard to control the safety and good will part of the distributor's business.

Standard contends, however, that this provision of the distributor's agreement is determinative on the question of control:

> It is understood and agreed that Distributor in the performance of this agreement is engaged in an independent business and nothing herein contained shall be construed as reserving to Company any right to control Distributor with respect to his physical conduct in the performance of this agreement.
>
> It is further understood and agreed that Company reserves no right to exercise any control over any of Distributor's employees and that all employees of Distributor shall be entirely under the control and direction of Distributor, who shall be responsible for their actions and omissions.

It is manifest, however, from what we have already said, that a written contract provision disclaiming control is not determinative on the question of control. The relationship of the parties, as amplified by the operating manual, the nature of the undertaking itself, and the amount of control actually exercised in performance of the undertaking, are the determinative factors.

Plaintiff's evidence showed that Standard routinely inspected the Vancouver plant and tested for purity samples of its products stored there. These inspections and tests were not mentioned in the distributor agreement. It is apparent from the evidence, however, that deficiencies uncovered during an inspection were to be corrected by the wholesale distributor in a manner that met with Standard's

approval. These inspections were primarily concerned with the appearance of the facility and with the safe and efficient operation of equipment and products owned by Standard.

Moreover, an employee of Standard informally inspected the facility at least once and normally twice a month. This employee testified that if he observed one of the wholesale distributor's employees violating a basic oil safety procedure, that he would direct that employee to stop the unsafe practice and bring the matter to the attention of the distributor. If the problem continued, he would report it to Standard.

The clear implication from this testimony was that Standard would enforce basic oil safety practices. It is true that there was no direct evidence that Standard's employees ever checked on or inspected the distributor's actual delivery operation, or ever sampled products in tank trucks ready for delivery. But a reasonable inference from the testimony presented is that if Standard were to acquire information about an unsafe practice in the actual delivery of its product to the customer, it would move immediately to correct the situation. In short, the wholesale distributor was required to conduct his operation by the manual.

We are aware that a split of authority exists on facts very similar to those presented here. *See* Annot., 83 A.L.R.2d 1282 (1962); *Burriss v. Texaco, Inc.*, 361 F.2d 169 (4th Cir. 1966). A review of these authorities convinces us that in many cases, the court finds or does not find "control" based on factors that have only a remote connection with the negligent activity which gave rise to a claim of vicarious liability. Based on the record before us, we have grave doubts as to whether the complex wholesale distributorship relation can be so neatly pigeonholed into either the independent contractor or the master-servant category for all purposes, as some authorities seem to imply.

Had the loss of life in this case resulted from negligent driving on the highway, or from some other activity unre-

lated to the safe handling of Standard's products, an entirely different result might have been reached on this agency question. Suffice it to say that in this instance plaintiff has adduced substantial evidence that Standard actually controlled the training of personnel engaged in delivery operations and had the right to control the actual delivery to the extent of insuring compliance with Standard's safety practices. For this reason, the order of dismissal as to Standard must be reversed and the case remanded for trial.

2. *Nondelegable Duty Theory.* In pressing for this theory, plaintiff, in effect, seeks an alternative means of establishing the vicarious liability of Standard in the event of an adverse finding on the issue of control.

This theory is expressed (although not in terms of non-delegable duty) in section 416, Restatement (Second) of Torts (1965). *See* footnote 3. That section was expressly adopted in this state in *Blancher v. Bank of Cal.,* 47 Wn.2d 1, 286 P.2d 92 (1955). In *Blancher,* a business establishment was determined to have a nondelegable duty to exercise due care to its business invitee, where a portion of the premises in which the invitee was injured was under renovation by an independent contractor and subcontractor.

It is also clear that a similar theory was previously utilized in Washington to remove the insulation generally afforded one who employs an independent contractor to achieve a particular result. *State v. Williams,* 12 Wn.2d 1, 120 P.2d 496 (1941); *Myers v. Little Church by the Side of the Road,* 37 Wn.2d 897, 227 P.2d 165 (1951). The breadth and scope of the theory has not, however, been explored.

The exceptions to the rule of nonliability of one who employs an independent contractor whose negligent act injures another are set forth in chapter 15, Restatement (Second) of Torts § 409, comment *b* at page 370 (1965). "They are so numerous, and they have so far eroded the 'general rule,' that it can now be said to be 'general' only in the sense that it is applied where no good reason is found for departing from it."

It is further pointed out in comment *b* that the exceptions fall into three broad categories:

(1) negligence of the employer in selecting, instructing, or supervising the contractor;

(2) nondelegable duties of the employer arising out of some relation toward the public or the particular plaintiff; and

(3) work which is especially, peculiarly, or "inherently" dangerous.

We note, somewhat cautiously, that those exceptions falling under categories (1) and (2) are generally grounded in liability based upon negligence of the contractor, and imputed to the one who employs him,[5] while those falling under category (3) may give rise to application of either imputed negligence or strict liability principles.

Section 416, Restatement (Second) of Torts, *supra* at page 395, the application of which is contended for in the case at bench, is stated in broad general language. It is entitled "Work Dangerous in Absence of Special Precautions."

According to its terms, it imposes liability on the employer of an independent contractor who is negligent, where the employer "should recognize" that the work is "likely to create *during its progress* a peculiar risk of physical harm to others unless special precautions are taken, . . . " (Italics ours.)

Both the title of section 416 and use of the phrase "during its progress" suggest that the harm for which vicarious liability is imposed must arise out of the *act of carrying out the work of the contract*, rather than harm stemming from the *negligent manner in which the work of the contract is performed*.

In comment *a* to section 416, the similarity between section 416 and section 427 is discussed. The latter section imposes vicarious liability on one who employs an indepen-

[5]It should be pointed out that plaintiff's first theory—that of respondeat superior—falls under the first category and is expressed in section 414, Restatement (Second) of Torts at page 387 (1965).

dent contractor who negligently carries out work involving a special danger to others which the employer should know to be *inherent in or normal to the work.*

Section 416, comment *a* at page 395 states that section 416 is more commonly applied where the employer should anticipate the need for some specific precaution, such as a railing around an excavation in the sidewalk, while section 427 is more commonly applied "where the danger involved in the work calls for a number of precautions, or involves a number of possible hazards, as in the case of blasting, . . ."

It seems to us that application of either section contemplates that the harm must arise during the course of the work. Were we to apply either section 416 or section 427 to the facts in the case at bench, the effect would be to hold the employer (Standard) vicariously liable for results of the negligent manner of performance by the independent contractor. To so hold, would, in our opinion, render Standard an insurer of the proper performance of its distributor, and cause all vestiges of the rule of nonliability to disappear.

We are unprepared to say that Standard had a nondelegable duty to plaintiff to insure that its distributor would not violate Standard's safety instructions and mix diesel oil with gasoline—absent the element of control or right to control previously discussed.

In discussing the nondelegable duty theory, an eminent writer suggests: (W. Prosser, *Torts* § 71 (4th ed. 1971) at 471.)

> It is difficult to suggest any criterion by which the non-delegable character of such duties may be determined, other than the conclusion of the courts that the responsibility is so important to the community that the employer should not be permitted to transfer it to another.

It is our view that the doctrine should be limited in its application to those injuries which should be contemplated by the employer as likely to occur "during the progress" of the work of the independent contractor.

In this case, the injury did not occur during the delivery of the oil, *i.e.,* during the progress of work requiring special precautions. More importantly, there is no evidence that failure to avoid commingling diesel oil and gasoline introduced any peculiar or greater risk in the delivery operation. Instead, the facts indicated that the increase in risk arose after the delivery because a highly explosive mixture was unknowingly handled and treated as a product that would burn at room temperature, but would not explode. For these reasons, the theory of nondelegable duty should not be submitted to the jury when the case is retried.

3. *Strict Products Liability.* Strict products liability is described in section 402A, Restatement (Second) of Torts, at page 347 (1965).

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

The doctrine was approved and applied by the Supreme Court in the threshold case of *Ulmer v. Ford Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969).

In its relatively short history as a replacement to the implied warranty theory, the breadth and scope of the doctrine has not been fully explored, although several cases concerning certain aspects of its applicability have been considered.[6]

---

[6] *See Palmer v. Massey-Ferguson, Inc.,* 3 Wn. App. 508, 476 P.2d 713 (1970); *Stark v. Allis-Chalmers,* 2 Wn. App. 399, 467 P.2d 854 (1970);

However, in approving the doctrine, the principal and concurring opinions in *Ulmer* both suggest that comment *g* to section 402A, Restatement (Second) of Torts, *supra* at 351 is an accepted explanation of the limitations of the rule.[7] In *Simmons v. Koeteeuw*, 5 Wn. App. 572, 489 P.2d 364 (1971) and in *Lamphiear v. Skagit Corp.*, 6 Wn. App. 350, 493 P.2d 1018 (1972) the proof requirements for application of the doctrine were also discussed in terms of comment *g*, and we repeat them here, preparatory to an analysis of the applicability of the doctrine of strict products liability to the facts of this case.

Plaintiff must show prima facie:

(1) that there was a defect

(2) which existed at the time the product left the hands of the manufacturer,

(3) which was not contemplated by the user,

(4) which renders the product unreasonably dangerous to the user or consumer;

(5) that the defect was the proximate cause of plaintiff's injury.

We have no difficulty in deciding that plaintiff established prima facie that a defect in the product existed (requirement 1), which rendered the product unreasonably dangerous to the user or consumer (requirement 4). The facts amply demonstrate that such a mixture of pure diesel oil with gasoline in the proportions involved is highly explosive—and the condition could not be discovered by use of the human senses. The facts also show that Zumwalt informed himself that the tank contained pure diesel oil and thus the latent danger was completely unappreciated (requirement 3). Moreover, the increased risk of explosion was foreseeable by Standard, as evidenced by statements

---

*Ewer v. Goodyear Tire & Rubber Co.*, 4 Wn. App. 152, 480 P.2d 260 (1971); *Reilly v. King County Central Blood Bank, Inc.*, 6 Wn. App. 172, 492 P.2d 246 (1971).

[7]*See Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 531 n.4, 452 P.2d 729 (1969), as well as page 535 of the concurring opinion of Justice Neill.

made in its Marketing Operating Manual. *See Ulmer v. Ford Motor Co., supra* at 534 n.7.

 Standard suggests, however, that deceased was not a user or consumer within the protected class, but even if he were, he was guilty of gross misuse of the product. First of all, this contention is composed of two separate issues: (1) Was the deceased within the protected class of individuals who may take advantage of the rule of strict liability? *Brown v. Quick Mix Co.*, 75 Wn.2d 833, 454 P.2d 205 (1969). (2) Did the deceased misuse the product so that he will be barred from recovery? *Stark v. Allis-Chalmers*, 2 Wn. App. 399, 467 P.2d 854 (1970). The burden of proof that deceased was within the protected class is on plaintiff. Misuse, on the other hand, like assumption of the risk, is an affirmative defense and the burden of proof falls on defendant. We conclude that plaintiff has adduced substantial evidence that he fell within the protected class of "users" as that term is employed in section 402A, Restatement (Second) of Torts, *supra*. Comment *l* to section 402A at page 354 states that

> "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

Moreover, in *Brown v. Quick Mix Co.*, 75 Wn.2d 833, 837, 454 P.2d 205 (1969), the court noted that the benefits of the rule of strict liability extend "to all whom the manufacturer should reasonably expect to use his product." Plaintiff's expert welders testified that diesel oil need not be cleaned from the interior of an enclosed tank prior to welding and that it was customary practice not to so clean metal storage tanks. Standard was shown to be an acknowledged expert in the field of petroleum products and oil safety. From these facts, we believe the jury is entitled to infer that Standard should reasonably have expected its product

to be "used" incident to a customary welding practice carried out in connection with the very storage tank employed to contain its product. Whether Zumwalt "misused" the product by failing to adequately purge the product before commencing welding operations, or assumed the risk of an explosion by inadequately testing the content of the tank is a matter of affirmative defense which Standard is not precluded from raising at the retrial of this case.

The major contention against application of strict products liability here relates to proof requirement (2), *i.e.*, did plaintiff establish prima facie that Standard's product was defective "at the time that it left the hands of the particular seller . . ." Comment *g*, section 402A, Restatement (Second) of Torts, *supra* at 351.

Plaintiff urges application of *Vandermark v. Ford Motor Co.*, 61 Cal. 2d 256, 391 P.2d 168, 37 Cal. Rptr. 896 (1964). It was held there that a manufacturer of a completed product may not insulate itself against strict liability by delegating to an authorized dealer the final steps in the manufacturing process.[8]

We do not think that *Vandermark v. Ford Motor Co., supra,* stands for the proposition that a manufacturer-seller is strictly liable for defects that are caused during the shipment to the buyer of a product that is "ready to use" when it leaves the seller's control. Moreover, plaintiff has not directed our attention to any authority for such a rule, nor has our research uncovered any. Instead, we find the reported cases concerned that the rule of strict liability not be expanded to the point that a manufacturer becomes

---

[8]We note that *Vandermark v. Ford Motor Co.*, 61 Cal. 2d 256, 391 P.2d 168, 37 Cal. Rptr. 896 (1964) was cited with approval in *Berg v. Stromme,* 79 Wn.2d 184, 484 P.2d 380 (1971) for the proposition strict liability extends to retail dealers. We have not found any Washington citation of *Vandermark* expressing approval of the point under discussion. We assume, although we specifically do not hold, that under the law of Washington, a manufacturer of a completed product may not avoid strict liability in tort by delegating a step in the manufacturing process to another.

an insurer of its product. *See, e.g.,* Justice Neill's concurring opinion in *Ulmer v. Ford Motor Co., supra.* For this reason, we decline to apply the rule of *Vandermark* to the facts of this case.

However, whether the product has "left the hands of the seller" should be a question of control. *See State Stove Mfg. Co. v. Hodges,* 189 So. 2d 113 (Miss. 1966). As previously indicated, we think there is substantial evidence that Standard retained the right to control purity of the product until delivered to the customer (DNR). If the jury determines this as a matter of fact, Standard must answer under section 402 A, Restatement (Second) of Torts, *supra,* for the condition of its product as delivered.

It was error to dismiss plaintiff's cause of action against Standard, for the reasons stated above.

Finally, we consider the claimed error of the trial court in dismissing with prejudice plaintiff's cause of action against the remaining defendants. This ruling occurred after plaintiff abandoned the trial when the court refused to allow a voluntary nonsuit.

Under CR 41(a)(1)B, plaintiff was not entitled to a voluntary nonsuit as a matter of right, since at the time of his motion he had already rested his opening case and defendants were proceeding with their testimony. *See McReynolds v. Thaler,* 49 Wn.2d 905, 307 P.2d 1060 (1957).

Under CR 41(a)(2), a voluntary nonsuit without prejudice is discretionary where good cause is shown and then upon such terms as the court deems proper. The only cause advanced by plaintiff is that he could not obtain a "just result" against "little people" when the alleged legally responsible "solvent appearing defendant" has been dismissed by the court.

Much as we might sympathize with the prevailing viewpoint of many lawyers that a solvent appearing defendant generates a potentially larger recovery than if only "little people" are involved, we and the trial court could hardly

accept that as "good cause" for requiring the "little people" to duplicate their efforts to defend themselves in a lengthy trial at a later time, when plaintiff has already presumably presented all the evidence he has against them.

Plaintiff offers us no additional reasons why the issues of liability of Jay Brockway, Austin Skordahl and Gary Skordahl could not have been satisfactorily resolved without the presence of Standard Oil as a defendant. Under these circumstances, we are unable to find an abuse of discretion in the refusal of the trial court to grant a permissive voluntary nonsuit. When plaintiff disobeyed the court's order to continue the trial, it is our view that he abandoned his action against them. Accordingly, the order dismissing those three defendants is affirmed.

There may be some contention made that collateral estoppel by judgment bars a new trial against Standard Oil Company. We would not agree with that contention. Aside from the lack of identity of the parties, the principal issues upon which Standard's liability is premised—namely, right of control and strict products liability—have not been fairly and fully litigated in the former action. *See Henderson v. Bardahl Int'l Corp.*, 72 Wn.2d 109, 431 P.2d 961 (1967).

Another problem which may arise on a new trial is the admissibility of certain exhibits which the trial court was reluctant to admit and send to the jury. The Marketing Operating Manual is one of the questioned exhibits. The portions of those exhibits which are relevant to the issues on which the case will be retried should be admitted and sent to the jury. We have examined the exhibits and agree with the trial court, that many portions have no relevancy and should be deleted. For example, the Marketing Operating Manual has several pages devoted to marine petroleum products, a subject with which the lawsuit is not even remotely concerned.

The trial court should rule on the portions of the exhibits

to which objection is made, being mindful of the issues to be decided by the jury. *See Nordstrom v. White Metal Rolling & Stamping Corp.,* 75 Wn.2d 629, 453 P.2d 619 (1969); *Raybell v. State,* 6 Wn. App. 795, 496 P.2d 559 (1972).

The judgment in favor of Standard Oil Company is reversed and that case is remanded for trial. The judgment of dismissal in favor of Jay Brockway, Austin Skordahl and Gary Skordahl is affirmed.

Costs on appeal will be allowed the three defendants whose judgment is affirmed. Costs on appeal in the action against Standard Oil Company will abide the outcome of the new trial.

PETRIE, C.J., and ARMSTRONG, J., concur.

Petition for rehearing denied January 23, 1973.

Review denied by Supreme Court March 6, 1973.