[No. 40752-3-II.   Division Two.   February 29, 2012.]

CHICAGO TITLE INSURANCE COMPANY, *Appellant*, v. THE OFFICE OF THE INSURANCE COMMISSIONER, *Respondent*.

*David C. Neu* (of *K&L Gates LLP*); and *Jessica A. Skelton* and *Matthew J. Segal* (of *Pacifica Law Group LLP*), for appellant.

*Robert M. McKenna, Attorney General,* and *Victor M. Minjares, Assistant,* for respondent.

*Stephen J. Sirianni* on behalf of Stewart Title Guaranty Company, amicus curiae.

¶1 JOHANSON, J. — Chicago Title Insurance Company seeks reversal of an Office of Insurance Commissioner (OIC) ruling, arguing that the ruling erroneously imposed vicarious liability on Chicago Title for the regulatory violations of Land Title Insurance merely because Chicago Title underwrites Land Title's title insurance policies. We hold that the OIC did not have statutory, inherent, or common law authority to impose vicarious liability on Chicago Title for regulatory violations Land Title committed. We reverse the OIC judge's decision and reinstate the administrative law judge's (ALJ) order granting summary judgment to Chicago Title.

## FACTS

### I. TITLE INSURANCE

¶2 Title insurance insures owners of real property against loss by encumbrance, defective title, or adverse claim. RCW 48.11.100. Consumers typically select title insurance in connection with a "middlem[a]n" (i.e., their real estate agent, builder, banker, etc.), who may exert great influence on the consumer's decision. Administrative Record (AR) at 470, 472. In 1988, Washington State's OIC adopted a rule to protect consumers by limiting the gifts or inducements that a title insurance company or its agent could offer to a middleman in return for steering customers into buying title insurance from specific companies. Former WAC 284-30-800.[1]

¶3 Chicago Title provides title insurance nationally. In eight Washington counties, Chicago Title maintains direct operations, meaning that it researches title,[2] proposes the policy, underwrites the policy, offers escrow and closing services, and markets all these services to customers. In smaller counties, Chicago Title maintains no direct operations and instead only underwrites the policies generated by independent title insurance companies, also known as underwritten title companies (UTC).

¶4 In an underwritten title insurance agreement, the UTC conducts its own marketing and sales, maintains the title plant, performs the research for clients, determines the commitments and exceptions to coverage, and collects all fees and premiums. The underwriting insurance company

---

[1] Former WAC 284-30-800 was in effect during the relevant period of this case. The legislature enacted a new regulatory scheme effective in 2009, RCW 48.29.210 and WAC 284-29-210 through WAC 284-29-260. These superseding regulations still prohibit excessive inducements.

[2] Title search requires that title companies maintain or subscribe to a title plant, which collects all documents recorded for real property in that county and indexes them by legal description or address.

contracts with the UTC to assume liability for title claims arising from the UTC's policies in exchange for a percentage of the title premiums. Generally, the underwriting title insurance company does not receive documents associated with closing or information about the policy or commitment except for (1) the policy number, (2) the internal file number, (3) the effective date of policy, (4) the type of policy, (5) the premium paid, and (6) the amount of liability. UTCs may have agreements with several underwriting title insurance companies, and underwriting title insurance companies may have agreements with several UTCs. This arrangement is beneficial to both small and larger insurance companies because RCW 48.29.020(3) requires that title insurers maintain sufficient capital. But small insurance companies generally lack the requisite capital and the larger title insurance companies are disinclined to maintain title plants in smaller counties, which generate less business and profit.

¶5 Chicago Title underwrites title insurance policies for 11 independent UTCs in Washington, including Land Title in Kitsap County. In 1992, Chicago Title and Land Title entered into a written contract, naming Land Title as the issuing agent and Chicago Title as the principal. The "Issuing Agency Agreement" provided:

> 3. Issuing Agent . . . shall have authority on behalf of Principal to sign, countersign and issue Principal's title assurances on forms supplied and approved by Principal and only on real property located in the County or Counties listed above. . . . Agent shall not be deemed or construed to be authorized to do any other act for principal not expressly authorized herein.
>
> 4. . . . Issuing Agent shall:
>
> . . . .
>
> B. Receive and process applications for title assurances
>
> (1) In accordance with usual customary practices and procedures and prudent underwriting principles; and
>
> (2) In full compliance with instructions, rules and regulations of Principal given to Issuing Agent.

AR at 519. The agreement further specified that Land Title pay Chicago Title 12 percent of the gross premium and "[c]omply with all federal and state, municipal ordinances, statutes, rules and regulations." AR at 519. The agreement also provided, "Issuing Agent shall not . . . [u]se the name of the Principal in any advertising or printing other than to indicate the Issuing Agent is a policy issuing agent of the Principal." AR at 520. In the agreement, the parties allocated losses by designating that Chicago Title was responsible for loss connected with any failure of the title search and Land Title was responsible for other causes of loss. The agreement retained Chicago Title's right to examine "all accounts, books, ledgers, searches, abstracts and the records which relate to the title insurance business." AR at 521.

¶6 Land Title employs sales personnel who market its services to potential customers in Kitsap County. Land Title makes no mention of Chicago Title in its marketing materials, which emphasize that Land Title is a local company performing title insurance and escrow and closing services. Land Title and Chicago Title have no relationship regarding Land Title's escrow and closing service, for which Land Title retains all of its fees and receives 28 percent of its total revenue. Chicago Title does not compensate Land Title for marketing expenses and does not exercise any control over Land Title's marketing practices or procedures.

¶7 In 2006, the OIC published a report on violations of the anti-inducement regulation. The investigation inspected 11 title insurance companies, including Chicago Title, but not Land Title. Prompted by its investigation, the OIC issued a technical assistance advisory to all Washington title insurers and title insurance agents clarifying the regulation's provisions and informing them that the law authorized the OIC to assess penalties for violations. The advisory did not mention UTCs or state that underwriting insurance companies would be liable for violations the UTCs commit.

¶8 In 2007, the OIC investigated Land Title for violations of the anti-inducement regulation and found multiple

violations. The OIC did not contact Chicago Title during its investigation of Land Title. After concluding its investigation, the OIC asked Chicago Title to sign an order (1) stipulating that Land Title's conduct violated the inducement regulation; (2) agreeing to pay a fine of $114,500 for Land Title's alleged violations; (3) submitting to a compliance plan, which included specific tracking and auditing provisions; and (4) declaring that Chicago Title has "the authority to comply fully with the terms and conditions of the [Compliance] Plan." AR at 514 (no. 6). Chicago Title refused to sign the order.

## II. PROCEDURE

¶9 In January 2008, the OIC filed a notice of hearing, proposing disciplinary action against Chicago Title (and not Land Title) for 13 alleged violations of the anti-inducement regulation committed solely by Land Title. The notice of hearing did not allege that Chicago Title participated in or knew of the violations but indicated that Land Title acted as Chicago Title's agent. The Office of Administrative Hearings (OAH) granted Chicago Title's request to transfer the matter to an ALJ.

¶10 Chicago Title and the OIC agreed to bifurcate the proceedings into two phases. In phase I, the ALJ would consider only whether Chicago Title could be vicariously liable for Land Title's actions. Depending on the outcome of phase I, in phase II the ALJ would consider whether Land Title actually violated regulatory provisions of the insurance code. Chicago Title moved for summary judgment on the vicarious liability issue.[3] The OIC opposed Chicago Title's summary judgment motion without filing a cross motion for summary judgment.

¶11 The ALJ granted summary judgment in favor of Chicago Title's motion and issued a number of "undisputed

---

[3] On appeal, the OIC erroneously suggests that Chicago Title "stipulated" to Land Title's regulatory violations. The parties merely reserved the question of Land Title's regulatory violation for phase II of the proceedings.

findings of fact" and conclusions of law. AR at 279 (capital-
ization and boldface omitted). The ALJ ruled that although
the insurance code provisions of Washington statutes
granted the OIC "broad authority" to take action against a
title insurer directly for its own violations, these code
provisions did not authorize imposing vicarious liability
where the common law of agency did not support such
imposition. AR at 291-92.

¶12 The OIC hearings unit accepted OIC's petition for
review of the ALJ's ruling. After hearing oral argument, the
OIC judge, ruling de novo, denied Chicago Title's motion for
summary judgment. The OIC judge ruled that the ALJ's
"[u]ndisputed findings of fact" were "actually disputed" by
the OIC, and she deleted or revised them. AR at 122. The
OIC judge also deleted or revised the ALJ's conclusions of
law and rejected the ALJ's reliance on "the principles of
common law agency," and instead adopted the conclusion
that the insurance code determined the insurer/insurance
agent relationship. Although stating it was not necessary,
the OIC judge added to the findings of fact that Chicago
Title was vicariously liable under a strict common law
analysis, including the theories of actual authority and
apparent authority. The OIC judge determined that the OIC
can hold Chicago Title responsible for Land Title's regula-
tory violations and transferred the case back to the OAH for
phase II of the proceedings.

¶13 Chicago Title petitioned for review, and the superior
court upheld the OIC judge's final decision. Chicago Title
appeals.

## ANALYSIS

### I. Standard of Review

¶14 "In reviewing a superior court's final order on
review of a Board decision, an appellate court applies the
standards of the Administrative Procedure Act directly to

the record before the agency, sitting in the same position as the superior court." *Honesty in Envtl. Analysis & Legislation (HEAL) v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 96 Wn. App. 522, 526, 979 P.2d 864 (1999). We review the OIC judge's legal determinations using the Administrative Procedure Act's (ch. 34.05 RCW) "error of law" standard, which allows us to substitute our view of the law for that of the OIC. *Verizon Nw., Inc. v. Emp't Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008); *see* RCW 34.05.570(3)(d).

¶15 We review an agency's interpretation or application of the law de novo. *HEAL*, 96 Wn. App. at 526. "We accord deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but we are not bound by an agency's interpretation of a statute." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). Where we review purely a question of law, however, we do not defer to the agency's interpretation. *Hunter v. Univ. of Wash.*, 101 Wn. App. 283, 291 n.3, 2 P.3d 1022 (2000), *review denied*, 142 Wn.2d 1021 (2001).

II. STATUTORY PROVISION OF AGENCY

A. Statutes Do Not Provide Vicarious Liability

¶16 The OIC argues that when read together, the insurance code statutes establish as a matter of law not only the existence of an agency relationship in the insurance context but also a scope of agency that makes the principal vicariously liable for the agent.[4] We disagree.

---

[4] The OIC also argues that the legislature need not have expressly granted the OIC authority to hold insurers vicariously liable because it provided the commissioner with authority "reasonably implied from the provisions" of this code. Br. of Resp't at 11; RCW 48.02.060(1). Although we agree that the insurance commissioner has authority to enforce provisions of the insurance code and to make reasonable rules and regulations according to rule making procedure, we disagree that by implication, the legislature authorized the insurance commissioner to

¶17 Former 48.17.010 (1985) defines an "agent" and permits an agent to "effectuate" insurance contracts, if authorized by the principal, and to collect premiums on those insurance policies.[5] Former RCW 48.17.160 (1994) describes the mandatory procedure for appointing an insurance agent, requiring filing with the commissioner and paying a fee.[6]

¶18 Relying on *Day v. St. Paul Fire & Marine Insurance Co.*, 111 Wash. 49, 53, 189 P. 95 (1920), the OIC argues that by enacting the insurance code in 1911, the legislature determined the scope of agency for insurance transactions as a pure issue of law. Although the *Day* court noted that the legislature passed the insurance code "for the purpose of clearly defining the insurance company's duties and liabilities" as a matter of law, the opinion recognizes only that the insurance code established a new method to determine who the law will consider to be an agent. *Day*, 111 Wash. at 54. *Day* does not address the scope of agency established between an insurance company and its appointed agent. *Day* neither states nor implies that per se vicarious liability should attach to the principal for an agent duly appointed under the statute. Washington's insurance code is silent regarding both the scope of agency generally and vicarious liability specifically.

---

declare one insurance company vicariously liable for another without a common law basis.

[5] Former RCW 48.17.010 defined "agent":

"Agent" means any person appointed by an insurer to solicit applications for insurance on its behalf. If authorized so to do, an agent may effectuate insurance contracts. An agent may collect premiums on insurances so applied for or effectuated.

[6] Former RCW 48.17.160 provides for the appointment of agents:

(1) Each insurer on appointing an agent in this state shall file written notice thereof with the commissioner on forms as prescribed and furnished by the commissioner, and shall pay the filing fee therefor as provided in RCW 48.14.010. The commissioner shall return the appointment of agent form to the insurer for distribution to the agent. The commissioner may adopt regulations establishing alternative appointment process for individuals within licensed firms, corporations, or sole proprietorships who are empowered to exercise the authority conferred by the firm, corporate, or sole proprietorship license.

¶19 The OIC also argues that the legislature expanded the insurance code after the *Day* opinion, eliminating the need for an extensive, case-by-case common law analysis to establish vicarious liability. But case law does not support the conclusion that by defining the term "agent" the legislature intended to establish the scope of every relationship authorized by former RCW 48.17.010. Instead, case law supports vicarious liability only on a common law basis. *Am. Fid. & Cas. Co. v. Backstrom*, 47 Wn.2d 77, 81, 287 P.2d 124 (1955) (after determining that an individual was properly considered an agent because he conformed to the statutory definition of "insurance agent," our Supreme Court applied common law agency principles to determine that the insurance agent's knowledge would be imputed to the principal); *see also Miller v. United Pac. Cas. Ins. Co.*, 187 Wash. 629, 638-39, 60 P.2d 714 (1936).

¶20 No authority supports the OIC's argument that the insurance code eliminates the need for a case-by-case common law analysis to establish vicarious liability, and we reject that argument.

## B. Common Law Vicarious Liability

¶21 Chicago Title argues that because it could not and did not control Land Title's marketing practices, it cannot be vicariously liable for Land Title's marketing practices under common law. We agree.

### 1. Right to control

¶22 When the facts are not in dispute and not susceptible to more than one interpretation, we determine vicarious liability in a business relationship as a question of law. *Larner v. Torgerson*, 93 Wn.2d 801, 804-05, 613 P.2d 780 (1980). We consider several factors before imposing vicarious liability, but the most crucial factor is the right to control the manner, method, and means by which the work and the desired result was to be accomplished. *Hollingbery*

*v. Dunn*, 68 Wn.2d 75, 80-81, 411 P.2d 431 (1966). When the superior business party has retained no right of control over the subordinate business party and there is no reason to infer a right of control, we will not hold the superior business party vicariously liable for the subordinate party's acts. *Larner*, 93 Wn.2d at 804-05. The significance of the principal's right to control the agent's operation pertains particularly to the " 'control or right of control over those activities from whence the actionable negligence flowed.' " *Kroshus v. Koury*, 30 Wn. App. 258, 264, 633 P.2d 909 (1981) (quoting *Jackson v. Standard Oil Co.*, 8 Wn. App. 83, 91, 505 P.2d 139 (1972), *review denied*, 82 Wn.2d 1001 (1973)), *review denied*, 96 Wn.2d 1025 (1982).

¶23 The agreement between Chicago Title and Land Title, which appointed Land Title as an issuing agent to potential insured persons, also precluded Land Title from marketing on Chicago Title's behalf. The OIC's identified regulatory marketing violations did not involve the insured person but involved the use of marketing practices that attempt to induce realtors and other middlemen to influence referrals for marketing purposes. Undisputed testimony from the president of Land Title included that

> [Chicago Title] does not play any role in or exercise any control over Land Title's business operations. [Chicago Title] does not provide any advice to Land Title on compliance with the Inducement Regulation. [Chicago Title] does not have any input in, or oversight of, Land Title's marketing practices or procedures.

AR at 499.

¶24 Despite maintaining that a common law analysis is superfluous, the OIC alternatively argues that Chicago Title is vicariously liable for Land Title's marketing because the pertinent parties never affirmatively disclaimed having the right to control Land Title but merely disclaimed

exercising that right.[7] OIC's argument relies on *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 119-20, 52 P.3d 472 (2002). But *Kamla* does not support the OIC's strained argument (that a party who fails to disclaim expressly the right to control, thereby acts affirmatively to establish the party's right to control). Additionally, the OIC misplaces its reliance on *Kamla* because that analysis involved direct, not vicarious, liability, which entails a different test.

¶25 The evidence shows that Land Title's alleged violations of the anti-inducement regulation involve strictly marketing issues. The evidence also shows that Chicago Title did not control any aspect of Land Title's marketing. Because Land Title's alleged violations of the anti-inducement regulation involve strictly marketing issues, the evidence does not support the OIC's alternative argument that the OIC judge properly found Chicago Title vicariously liable under a strict common law agency analysis. *See Stephens v. Omni Ins. Co.*, 138 Wn. App. 151, 183, 159 P.3d 10 (2007), *aff'd*, 166 Wn.2d 27, 204 P.3d 885 (2009).

## 2. Doctrine of apparent authority

¶26 The OIC argues that the OIC judge properly found Chicago Title vicariously liable under the theory of apparent authority[8] because Chicago Title's compliance with the insurance code's procedure to appoint an agent objectively manifested that Land Title acted on its behalf. We disagree.

---

[7] The OIC argues that because the written agreement preserves Chicago Title's right to inspect Land Title's books, Chicago Title must affirmatively rebut the implication that it had a right to control Land Title. But evidence that Chicago Title retained general contractual rights does not support the OIC's assertion that Chicago Title retained the specific right at issue here, i.e., the right to control Land Title's marketing.

[8] The OIC also argues that because Chicago Title did not address apparent authority in its opening brief, it conceded that argument. But in its opening brief, Chicago Title assigned error to the OIC judge's findings of fact and conclusions of law asserting the doctrine of apparent authority, and in its reply brief, Chicago Title responded fully to the OIC's apparent authority argument. Thus, Chicago Title has not conceded this argument. RAP 10.3(c); *City of Spokane v. White*, 102 Wn. App. 955, 963, 10 P.3d 1095 (2000), *review denied*, 143 Wn.2d 1011 (2001).

¶27 "An agent has apparent authority to act for a principal only when the *principal* makes objective manifestations of the agent's authority 'to a third person.' " *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 555, 192 P.3d 886 (2008) (quoting *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994)). The apparent authority doctrine protects third parties who justifiably rely upon the belief that another is the principal's agent. *D.L.S. v. Maybin*, 130 Wn. App. 94, 98, 121 P.3d 1210 (2005). The doctrine has three basic requirements: (1) the putative principal's actions must lead a reasonable third party to conclude that the actors are employees or agents, (2) the innocent third party must believe they are agents, and (3) the third party must rely on that mistaken belief to its detriment. *D.L.S.*, 130 Wn. App. at 98. The innocent third party's subjective belief must be objectively reasonable based on the principal's specific objective manifestation. *Ranger Ins. Co.*, 164 Wn.2d at 555 (power of attorney to post bonds on behalf of principal does not constitute an objective manifestation of authority to redirect funds).

¶28 The apparent authority doctrine is inapplicable here because that doctrine's purpose is to provide judicial recourse for innocent third parties whose reliance has harmed them, which circumstance is not present here. *See D.L.S.*, 130 Wn. App. at 98. Additionally, the OIC's apparent authority argument depends on its statutory authority argument and does not constitute a strict common law analysis. Finally, Chicago Title's filing of the required OIC form and paying the required OIC fee to make Land Title its issuing agent does not constitute a specific, objective manifestation that it authorized Land Title to violate the anti-inducement regulation. *See Ranger Ins. Co.*, 164 Wn.2d at 555.

¶29 The OIC does not show a basis upon which to impose vicarious liability, neither on the doctrine of actual authority nor on the doctrine of apparent authority. Neither does the law support the OIC's argument that the insurance

code, which defines and establishes the mandatory procedure for the appointment of an insurance agent, eliminates the need for a case-by-case common law analysis. Finally, the OIC fails to explain why Land Title should not be solely accountable for its own alleged violations of anti-inducement regulations.[9] We hold that the OIC does not have statutory authority to impose vicarious liability on Chicago Title for Land Title's marketing, nor does it show that vicarious liability is proper under the common law.[10]

¶30 We reverse the OIC judge's decision and reinstate the ALJ's order granting summary judgment to Chicago Title.

HUNT and VAN DEREN, JJ., concur.

Review granted at 174 Wn.2d 1012 (2012).

---

[9] The OIC implies that unless we hold title insurance underwriters vicariously liable for their UTCs, insurance code violations will go unregulated. We note, however, that nothing in this opinion prevents the OIC from holding the UTCs solely responsible for complying with anti-inducement regulations.

[10] Because we hold that the OIC neither has statutory authority to impose vicarious liability nor shows that vicarious liability is proper under the common law, we do not reach Chicago Title's alternative argument that the OIC judge exceeded its delegated legislative authority and effectively promulgated a de facto regulation.