**FILE**

IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE **AUG 01 2013**

_____ for CHIEF JUSTICE

This opinion was filed for record
at 8:00 a.m. on Aug 1, 2013

Ronald R. Carpenter
Supreme Court Clerk

## IN THE SUPREME COURT OF THE STATE OF WASHINGTON

CHICAGO TITLE INSURANCE COMPANY, an )
Authorized Insurer, )
  )
  )    No. 87215-5
Respondent, )
  )    En Banc
v. )
  )
WASHINGTON STATE OFFICE OF THE )    Filed _____ AUG 01 2013 _____.
INSURANCE COMMISSIONER, )
  )
Petitioner. )
  )

WIGGINS, J.— Washington State strictly regulates how insurance may be provided and marketed in order to protect the consumer. Applicable statutes and regulations prohibit an insurer or its agent from giving out inducements for the purpose of obtaining title insurance business. Chicago Title Insurance Company (CTIC) appointed Land Title Insurance Company as its agent for the purpose of soliciting and effectuating CTIC's insurance policies. Land Title violated the anti-inducement laws. We hold that CTIC is responsible for Land Title's regulatory violations, pursuant to statutory and common-law theories of agency. When the statute forbids the insurer or its agent from certain conduct, it means that the insurer

may not do indirectly—through its agent—what it may not do directly. We reverse the Court of Appeals.

FACTS

I.  Background – Title Insurance

Typically, insurance protects against a contingency that might occur in the future, such as a fire or flood. Title insurance is different—it protects against *past* claims against the insured real estate, such as forged signatures on transfer documents, unpaid real estate taxes, and liens that cloud title on the property. Title insurance is also unique in two ways significant to this case: first, in how it is provided and, second, in how it is marketed and regulated.

Before a title company issues a title insurance policy, it must research the state of title to the property in question, which is done using an archive called a tract index or "title plant."[1] Admin. R. (AR) at 469, 514. The Washington Insurance Code requires a title insurance company to own, lease, or maintain a complete set of tract indexes in every county where it transacts business. RCW 48.29.020(2), .040(1). A title company can satisfy this requirement by retaining a "duly authorized agent" with a complete set of tract indexes in a county where it transacts business. RCW 48.29.040(1). An agent is "any person appointed by an insurer to solicit applications for insurance on its behalf." Former RCW 48.17.010 (1985).[2] The insurance code also governs the process for appointing an agent. RCW 48.17.160.

---

[1] This process is called "abstracting." *First Am. Title Ins. Co. v. Dep't of Revenue,* 144 Wn.2d 300, 302, 27 P.3d 604 (2001).

[2] This definition was in effect at the time of the administrative proceedings at issue in this

2

Some title insurers utilize a type of agent called an underwritten title company (UTC). A title insurer that wishes to market its policies in a small county might not own a title plant there; a prospective UTC might own a title plant in that county but be legally unable to sell insurance.[3] Therefore, the title insurer and the UTC agree to sell their services as a bundle. The consumer buys the title insurer's policy, supported by the UTC's abstracting work. *First Am. Title Ins. Co. v. Dep't of Revenue,* 144 Wn.2d 300, 304, 27 P.3d 604 (2001). A UTC may offer other services as well. For tax purposes, "a UTC is not a mere insurance agent or broker, but rather generates business for its own account . . . ."[4] *Id.* at 305.

Title insurance is also special in that it is purchased as part of the closing of a real estate transaction. Sometimes title insurance is mandatory in order to secure the funds to close on the transaction. In many cases, consumers have little real opportunity to shop around or to make an informed decision about what title insurance policy to buy; to the consumer, title insurance is "just one more expensive step in the dizzying, convoluted and often confusing flurry of paperwork and signings that culminate in the closing of the home purchase." AR at 469-70. Many consumers

---

case. The present statute defines a "title insurance agent" as "a business entity licensed under the laws of this state and appointed by an authorized title insurance company to sell, solicit, or negotiate insurance on behalf of the title insurance company." RCW 48.17.010(16).

[3] For instance, the UTC might not meet the insurance code's minimum capital stock requirements to sell title insurance. RCW 48.29.020(3); RCW 48.05.340.

[4] In *First American Title Insurance Company,* we specifically disclaimed any reliance on principles of agency. 144 Wn.2d at 304 n.1. Therefore, *First American Title* is not controlling authority as to our agency analysis below and is not further discussed in this opinion.

ultimately buy title insurance from whomever a real estate agent, bank, or other major party to the transaction recommends.

This model is called "reverse competition" because title companies do not cater to their consumers' needs, but to the needs of the middlemen who can recommend a consumer to a title insurer. AR at 470. Indeed, title companies spend nearly all of their marketing budgets "wining and dining" middlemen in order to gain referrals. *Id.* Because this model creates significant potential for abuse, both the legislature and Office of the Insurance Commissioner (OIC) impose strict restrictions on gifts and other inducements to middlemen. At the time of the administrative proceedings below, former RCW 48.30.150 (1990) provided that

> [n]o insurer, general agent, agent, broker, solicitor, or other person shall, as an inducement to insurance, or in connection with any insurance transaction, provide in any policy for, or offer, or sell, buy, or offer or promise to buy or give, or promise, or allow to, or on behalf of, the insured or prospective insured in any manner whatsoever:
>
> . . . .
>
> (3)    Any prizes, goods, wares, or merchandise of an aggregate value in excess of twenty-five dollars.

Similarly, OIC enjoys broad authority to define unfair or deceptive trade practices, RCW 48.30.010(2), and the commissioner has clarified through rule making that

> (1)    RCW 48.30.140 and 48.30.150, pertaining to "rebating" and "illegal inducements," are applicable to title insurers *and their agents.*
>
> . . . .
>
> (2)    It is an unfair method of competition and an unfair or deceptive act or practice for a title insurer *or its agent,* directly or indirectly, to offer, promise, allow, give, set off, or pay anything of value exceeding twenty-five dollars, calculated in the aggregate over a twelve-month period on a per person basis in the manner specified in RCW 48.30.140(4), to any person as an inducement, payment, or reward for placing or causing title insurance business to be given to the title insurer.

4

Former WAC 284-30-800 (1990) (emphasis added).[5] The present case involves alleged violations of former WAC 284-30-800 on the part of CTIC's duly appointed agent, as described below.

## II. Land Title's Relationship with CTIC

Land Title is one of several duly appointed agents of CTIC. Land Title is not authorized to sell insurance in Washington; rather, it is a UTC of CTIC. According to OIC's records, Land Title is authorized to issue title insurance for only one insurer: CTIC. AR at 347. Aside from selling CTIC's title insurance policies, Land Title markets escrow services, which constitute 28 percent of its total revenue. Land Title requires all of its escrow customers to purchase title insurance as well. AR at 510 ("TITLE INSURANCE . . . Must be provided in conjunction with every escrow transaction provided by this office.").

Land Title and CTIC entered into an "Issuing Agency Agreement" (Agreement) providing for Land Title to issue CTIC's title assurances in four Washington counties: Kitsap, Clallam, Jefferson, and Mason. In these four counties, CTIC conducts no direct operations.

The Agreement authorizes Land Title to "sign, countersign and issue Principal's title assurances on forms supplied and approved by Principal and only on real property located in the County or Counties listed above, and in such other Counties as may be designated in writing by Principal . . . ." AR at 519, at ¶ 3.

---

[5] This section of the Washington Administrative Code has since been repealed and superseded by RCW 48.29.210 and WAC 284-29-200 through 284-29-260. Wash. St. Reg. 09-05-077 (Mar. 20, 2009).

However, Land Title is not authorized to do "any other act for principal not expressly authorized herein." *Id.* Land Title must use forms supplied by CTIC and charge only premiums approved by CTIC, but may not use CTIC's name in any advertising or printing other than to indicate its status as CTIC's policy issuing agent.

CTIC retains the power to decide questions of risk for Land Title and is "fully authorized and empowered in its absolute discretion, to defend, settle, compromise or dispose of any claim for which any party to this Agreement may be liable." AR at 521, at ¶ 10.B.

III.    Inducement Violations and OIC Enforcement

In 2005, OIC launched an investigation into the marketing practices of several major title insurers operating in Washington. Over the 10-month investigation, OIC found that violations of former RCW 48.30.140 (1994) and former 48.30.150 were "widespread and pervasive" and that the entire industry was "rife with practices gone haywire. . . . [T]he consumer, who ultimately pays for the coverage, is the only source of money for these illegal expenses." AR at 473-E. OIC further found that "some of the major offenders view the law as little more than a nuisance standing between them and their ability to have business steered to them from their middlemen, go-betweens and associates in the real estate business." AR at 473-L.

CTIC was no exception. Over a period of 18 months, CTIC co-advertised with middlemen (a cost of $100 to $4,300) over 150 times. CTIC bought food for hundreds of middlemen meetings and broker opens, sponsored golf tournaments (over $3,000), hosted receptions and hospitality suites ($13,000), and, on one occasion, purchased 26 seats ($2,400) at a Seahawks game. These unlawful

6

expenditures were not atypical, but rather CTIC's violations were "somewhere in the middle of the pack when [CTIC]'s violation record is compared to other companies." AR at 473-H. OIC did not act on the violations it found at that time, but published its findings in a written report, AR at 473-A through 473-N. In November 2006, OIC issued a technical assistance advisory to all Washington title insurers and title insurance agents, intended to "clarify requirements [of the anti-inducement laws] for title insurers and their agents." AR at 473AF.

In 2007, OIC began investigating Land Title. For purposes of the motion now on review, CTIC has stipulated that Land Title violated the anti-inducement statutes through "'wining and dining' of real estate agents, builders, and mortgage lenders with meals, golf tournaments, advertising for one real estate agent; purchases at a Board of Realtors auction; and professional football championship game tickets, in amounts over the $25.00 limit allowed by [former] WAC 284-30-800." AR at 279.

In November 2007, the OIC approached CTIC with a "Consent Order Levying Fine," which provided for CTIC to

> (1) stipulate that Land Title's conduct violated the Inducement Regulation, (2) agree to pay a fine of $114,500 based on Land Title's alleged violations, and (3) enter into a Compliance Plan that required specific tracking of expenditures, semi-annual internal audits and related reporting and corrective actions and to represent that Chicago title[sic] has "the authority to comply fully with the terms and conditions of the [Compliance] Plan."

AR at 514. CTIC refused to sign the consent order.

IV.   Administrative Proceedings

OIC brought disciplinary proceedings against CTIC. The parties agreed to bifurcate the action into a phase I, concerning only CTIC's vicarious liability for Land

7

Title's actions, and a phase II, concerning only whether Land Title had violated the law.[6]

CTIC moved for summary judgment on phase I, and Administrative Law Judge (ALJ) Cindy L. Burdue granted CTIC's motion. The ALJ held that the Agreement created between CTIC and Land Title a "traditional agency relationship, which specifically limited the control by the principal to those items specifically set out in the contract." AR at 290. Therefore, CTIC had no right to control Land Title's marketing practices.

OIC Review Judge Patricia D. Petersen reversed the ALJ's decision. The review judge held that regardless of any private contract terms between CTIC and Land Title, Land Title was performing within its statutory authority as an "agent" under former RCW 48.17.010. Thus, whether or not the Agreement allowed Land Title to solicit or market insurance was irrelevant. Rather, "[w]hether or not Chicago chooses to be involved or otherwise participate in these activities which are conducted on its behalf does not affect the relationship of Chicago as the appointing insurer and Land Title as its appointed agent." AR at 133.

V.   Judicial Proceedings

CTIC petitioned for review and the superior court affirmed the review judge's order without opinion. Clerk's Papers at 163-64. CTIC then appealed to Division Two

---

[6] On October 5, 2009, while the petition for judicial review was pending, OIC and CTIC entered into a stipulation and agreement admitting that Land Title violated former WAC 284-30-800 and settling the phase II adjudication in full. Whether Land Title committed the alleged violations is no longer an issue in this case. For our purposes, we may assume it did.

of the Court of Appeals, which reversed the superior court in a published opinion, *Chi. Title Ins. Co. v. Office of Ins. Comm'r,* 166 Wn. App. 844, 271 P.3d 373 (2012). The Court of Appeals held that CTIC was not vicariously liable for Land Title's actions, either through statute or through the common law.

First, the Court of Appeals agreed with the ALJ that the insurance code only created the agency relationship without defining what acts were within the scope of agency authority: "Washington's insurance code is silent regarding both the scope of agency generally and vicarious liability specifically." *Chi. Title,* 166 Wn. App. at 853. Second, the Court of Appeals held that CTIC bore no vicarious liability at common law because it had no "'input in, or oversight of, Land Title's marketing practices or procedures.'" *Id.* at 855 (quoting AR at 499). Finally, the Court of Appeals rejected OIC's argument that Land Title had apparent authority to market on CTIC's behalf, holding that CTIC's registration of Land Title as its agent pursuant to RCW 48.17.160 did not amount to a "specific objective manifestation" that CTIC authorized Land Title to violate the anti-inducement laws. *Chi. Title,* 166 Wn. App. at 857. Therefore, the Court of Appeals reversed the OIC review judge and reinstated the ALJ's order granting summary judgment. OIC timely appealed, and this court granted review. *Chi. Title Ins. Co. v. Office of Ins. Comm'r,* 174 Wn.2d 1012, 281 P.3d 687 (2012).

## ANALYSIS

Land Title's unlawful inducements constituted solicitation, for which CTIC is responsible as Land Title's principal. Whatever CTIC and Land Title believed about their agency relationship, the statute makes the authority to solicit an inherent part of

Land Title's agency. But even without the statute, CTIC would be vicariously liable at common law. When CTIC gave Land Title the authority to sell its insurance, CTIC also gave Land Title implied authority to perform other acts necessary to the sale of insurance and to act in accordance with industry norms. Solicitation was necessary to effectuate Land Title's authority to sell CTIC insurance under the Agreement, and violating the anti-inducement provisions was customary in the title insurance industry. Having found statutory and implied authority, we need not reach the alternative test of whether CTIC had the right to control Land Title's marketing practices.

I.   Standard of Review

Judicial review of the commissioner's final order is governed by RCW 34.05.570(3). That statute enumerates nine circumstances under which the court may grant relief from an agency order in an adjudicative proceeding. CTIC alleges that the OIC review judge's order was outside the "statutory authority or jurisdiction of the agency," RCW 34.05.570(3)(b); that OIC "erroneously interpreted or applied the law," RCW 34.05.570(3)(d); and that the order was arbitrary or capricious, RCW 34.05.570(3)(i). In reviewing an agency order, this court sits in the same position as the superior court and applies the standards of the Administrative Procedure Act (APA), chapter 34.05 RCW, to the agency record. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd.*, 136 Wn.2d 38, 45, 959 P.2d 1091 (1998). This court reviews an agency's interpretation or application of the law de novo. Legal determinations are reviewed using the "'error of law'" standard, which allows the court to substitute its view of the law for that of the OIC. *Verizon Nw., Inc. v. Emp't*

10

*Sec. Dep't,* 164 Wn.2d 909, 915, 194 P.3d 255 (2008) (quoting former RCW 34.05.570(3)(d) (2004)). This court "accord[s] deference to an agency interpretation of the law where the agency has specialized expertise in dealing with such issues, but . . . [is] not bound by an agency's interpretation of a statute." *Cent. Puget Sound Growth Mgmt. Hearings Bd.,* 136 Wn.2d at 46. The agency's interpretation of pure questions of law is not accorded deference. *Hunter v. Univ. of Wash.,* 101 Wn. App. 283, 292, 2 P.3d 1022 (2000).

II.   Arguments of the Parties

OIC argues that the insurance code and its own regulations displace the common law and establish the scope of CTIC's vicarious liability. Under OIC's theory, the statute places solicitation within the scope of an appointed agent's authority, meaning that the principal is necessarily liable for its appointed agent's solicitation activities. Furthermore, the "directly or indirectly" language of former WAC 284-30-800(2) makes CTIC liable for Land Title's unlawful inducements notwithstanding common law agency.

But even if common law agency applies, OIC asserts, CTIC had the right to control Land Title's actions because it retained the right to inspect Land Title's records and would have discovered the illegal inducements had it done so. Furthermore, CTIC clothed Land Title with apparent authority to solicit insurance and thus to carry out an unlawful inducement scheme.

In response, CTIC asserts that Land Title's marketing activities were both outside the scope of the agency relationship and outside of CTIC's control. CTIC contends that the statute merely establishes that Land Title is an agent, but the

statute has no bearing on the scope of Land Title's agency. Rather, in CTIC's view, the right to control is dispositive. Because CTIC played no part and had no control over Land Title's marketing practices, CTIC should not be held liable for Land Title's unlawful inducements.

## III. The Insurance Code and Regulations

Whatever the principal and agent believe, by definition, an insurance agent in Washington has authority to solicit. The insurance code comprehensively governs the relationship between agent and insurer, specifically enumerating the duties and powers an agent possesses. *Day v. St. Paul Fire & Marine Ins. Co.,* 111 Wash. 49, 52, 189 P. 95 (1920). Solicitation is one such power: former RCW 48.17.010.[7] defines an agent as "any person appointed by an insurer to solicit applications for insurance on its behalf." Under the plain language of the statute, a duly appointed agent is *necessarily* authorized to solicit insurance for its appointing insurer— whatever other activities the agent may conduct on the side.

CTIC concedes that Land Title is an agent but characterizes it as a "limited agent" with no authority to market for CTIC. Suppl. Br. of Resp't at 1. But the authority to solicit necessarily includes the authority to market. The meaning of solicitation "includes inviting, requesting, urging, or advising a person to subscribe to insurance, endeavoring to obtain such a subscription, or approaching a person for the purpose of receiving an application for insurance coverage." *Nat'l Fed'n of*

---

[7] The statute governing the proceedings at issue here has since been amended to define a "title insurance agent" as an entity appointed by a title insurance company "to sell, solicit, or negotiate insurance on behalf of the title insurance company." RCW 48.17.010(16).

*Retired Persons v. Ins. Comm'r*, 120 Wn.2d 101, 110-11, 838 P.2d 680 (1992) (NFRP) (citing *Paulson v. W. Life Ins. Co.*, 292 Or. 38, 62, 636 P.2d 935 (1981)). We define "solicitation" broadly, and we do not require that the person approached be an end consumer, nor that the solicitor seek applications for its *own* insurance. When Land Title approaches a middleman for the purpose of receiving an application (from that middleman's customers) for a CTIC insurance policy, Land Title is soliciting for CTIC. In other words, Land Title is doing what CTIC appointed it to do pursuant to statute. When Land Title solicits in an unlawful way, CTIC is responsible.

CTIC argues that the Agreement controls over the statute and withdraws Land Title's authority to engage in solicitation. *See* AR at 519, at ¶ 3 ("Issuing Agent shall not be deemed or construed to be authorized to do any other act for principal not expressly authorized herein."); AR at 520, ¶ 6(G) ("Issuing Agent shall not, without prior written consent of Principal . . . Use the name of the Principal in any advertising or printing other than to indicate the Issuing Agent is a policy issuing agent of the Principal."). This argument overlooks the fact that solicitation is inherently part of Land Title's authority to sell title insurance. In any event, CTIC's argument founders on our decision in *Pagni,* where we held that

> an insurance company is bound by all acts, contracts, or representations of its agent, whether general or special, which are within the scope of his real or apparent authority, *notwithstanding they are in violation of private instructions or limitations upon his authority*, of which the person dealing with him, acting in good faith, has neither actual nor constructive knowledge.

*Pagni v. N.Y. Life Ins. Co.*, 173 Wash. 322, 349-50, 23 P.2d 6 (1933) (emphasis added) (quoting 32 C.J. § 140, at 1063). That is to say, where an agent acts within

its authority, the principal cannot excuse itself from vicarious liability through an undisclosed private arrangement that purports to restrict that authority. Here, the statute provides the authority, and the Agreement was an undisclosed private contract between CTIC and Land Title.

The *Pagni* rule is further supported by the Ninth Circuit Court of Appeal's interpretation of a comparable Oregon statute. In *NFRP*, we looked to the Oregon Supreme Court's interpretation of the term "solicit" in Oregon Revised Statutes 744.165 to aid us in interpreting the same term in our own insurance code. In turn, federal courts have interpreted the same Oregon statute to indicate a legislative intent to "make acts or statements of one who solicits or procures an application of insurance from the insured, binding on the company whose coverage is being sold, regardless of 'waivers' to the contrary by either the insurer or the intermediary." *Lien Ho Hsing Steel Enter. Co. v. Weihtag*, 738 F.2d 1455, 1459 (9th Cir. 1984).

Here, too, the purpose of the statute would be defeated if an insurer could gain the benefits of appointing an agent (here, the ability to sell insurance in a locale where it lacks a title plant) while waiving any attendant liability through contract. As we recognized in *Day*, the insurance code creates a statutory standard of agency that agents and their principals cannot opt out of at their own discretion.

IV.    Common Law: Inherent or Implied Agency Power

Independent of the statute, Land Title had the authority to solicit insurance for CTIC and to bind CTIC by its unlawful solicitations. This court has recognized that a principal's grant of authority may come with implied authority to perform other acts that are necessary steps to achieving the principal's objective or that are customary

for agents performing the work. In *Debentures, Inc. v. Zech*, 192 Wash. 339, 348, 73 P.2d 1314 (1937), an agent was left in possession of a building and authorized to collect rents and manage, operate, and maintain the building. We held that this grant of authority also gave the agent "implied authority as a necessary incident to the exercise of his powers, to order and to direct that reasonable expenditures be made for the purpose of redecoration." *Id.* We have also held that an agent who is empowered to sell is presumptively empowered to make a warranty as "necessary to consummate the contract . . ." so long as "it is usual in the market to give a warranty . . . ." *Johns v. Jaycox*, 67 Wash. 403, 406, 121 P. 854 (1912). We have held that a real estate agent "employed for the sole purpose of procuring a purchase for real property . . ." nevertheless had the authority to exhibit the property and make representations about its area and boundary lines, because negotiation would be impossible otherwise. *Yarnall v. Knickerbocker Co.*, 120 Wash. 205, 209-10, 205 P. 936 (1922); *see also Walker v. Pac. Mobile Homes, Inc.*, 68 Wn.2d 347, 351, 413 P.2d 3 (1966) ("Authority to perform particular services for a principal carries with it the implied authority to perform the usual and necessary acts essential to carry out the authorized services."); *Hoglund v. Meeks*, 139 Wn. App. 854, 866, 170 P.3d 37 (2007) ("Nonetheless, actual authority to perform certain services on a principal's behalf results in implied authority to perform the usual and necessary acts associated with the authorized services."); *Cameron v. Downs*, 32 Wn. App. 875, 881, 650 P.2d 260 (1982) ("To be within the scope of one's agency, conduct must be of the same general nature as that authorized, or incidental to the conduct authorized.").

The idea that an agent's authority expands to cover necessary or customary acts is not novel but is well supported by the *Third Restatements of Agency* (*Second*) and (*Third*). The *Second Restatement* defines "[i]nherent agency power," which arises not from the principal's authorization to perform the acts at issue, nor from apparent authority or estoppel, "but solely from the agency relation and exists for the protection of persons harmed by or dealing with a servant or other agent." RESTATEMENT (SECOND) OF AGENCY § 8A (1958).[8] The theory of inherent agency power recognizes that agents may be overzealous or careless in doing the work assigned by the principal and may harm third parties as a result. In that case, "[it] would be unfair for an enterprise to have the benefit of the work of its agents without making it responsible to some extent for their excesses and failures to act carefully." *Id.* cmt. a. Therefore, the *Second Restatement* makes the principal liable on a transaction where "a general agent does something similar to what he is authorized to do, but in violation of orders." *Id.* cmt. b. As the *Second Restatement* goes on to explain,

> [a] general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal, the other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized.

---

[8] This section has been superseded by *Restatement (Third) of Agency* § 2.02 (2006), discussed *infra*.

RESTATEMENT (SECOND) OF AGENCY § 161.[9] This rule is especially pertinent where an agent comprises an "essential part[] of [the principal's] business enterprise." *Id.* at cmt. a. We applied this principle in *Miller v. United Pacific Casualty Insurance Co.*, 187 Wash. 629, 636, 60 P.2d 714 (1936), where we held that if an insurer could do business only through an authorized agent, that agent acted as the insurer's "alter ego" and could bind the insurer through its acts.

Likewise, the *Third Restatement* includes acts "necessary or incidental to achieving the principal's objectives" within the actual authority of an agent. RESTATEMENT (THIRD) OF AGENCY § 2.02(1) (2006). The *Third Restatement* approach considers that an agent may reasonably assume "that the principal wishes, as an incidental matter, that the agent take the steps necessary and that the agent proceed in the usual and ordinary way, if such has been established, unless the principal directs otherwise." *Id.* cmt. d at 9. Even if the principal purports to forbid certain acts on the part of an agent, the agent may reasonably believe itself to be authorized if the principal "affirmatively approve[s] of the agent's unauthorized act or silently acquiesce[s] in it by failing to voice affirmative disapproval." *Id.* cmt. f at 100.

Similarly, Mechem states that "every delegation of authority whether 'general' or 'special,' carries with it, unless the contrary be expressed, implied authority to do all of those acts, naturally and ordinarily done in such cases, which are reasonably necessary and proper to be done in this case in order to carry into effect the main authority conferred." 1 FLOYD R. MECHEM, A TREATISE ON THE LAW OF AGENCY § 715

---

[9] *See id.*

(2d ed. 1914). Like the *Third Restatement*, Mechem points out that the principal presumably means for the agent to perform those acts reasonably necessary to carry out those acts the principal expressly authorizes and also for the agent to do business in the "usual and ordinary way." *Id.* Therefore, even if the statute did not control, Land Title was implicitly authorized to solicit applications for insurance as a necessary act in executing its authority to issue and effectuate insurance for CTIC. CTIC carried out no direct operations in those counties where Land Title was employed to sell its insurance. If CTIC was not advertising in those areas, and Land Title could not advertise for title insurance, then no one would purchase CTIC insurance from Land Title. This cannot be the result that CTIC intended when it appointed Land Title as its agent. Just as we found a selling agent had the implied authority to exhibit the property in *Yarnall,* 120 Wash. at 209-10, we hold that Land Title, as an issuing agent, must have the authority to solicit applications for insurance. If it had no authority to attract consumers in the first instance, then its authority to issue and effectuate insurance contracts would be meaningless.

Land Title is authorized to solicit for CTIC under both statute and common law. Following the *Restatement (Second) of Agency* § 161 test, we now turn to whether Land Title was a general agent and whether unlawful inducements were necessary or customary in executing the authority to solicit.

*A. Land Title was a general agent of CTIC*

A "general agent" is "'an agent authorized to conduct a series of transactions involving a continuity of service.'" *Costco Wholesale Corp. v. World Wide Licensing Corp.,* 78 Wn. App. 637, 646, 898 P.2d 347 (1995) (quoting RESTATEMENT (SECOND)

OF AGENCY § 3(1)). A "general agent" is to be distinguished from a "special agent," or "'an agent authorized to conduct a single transaction or a series of transactions not involving continuity of service.'" *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 3(2)). Some factors that aid in determining an agent's status include "the number of acts performed, number of persons with whom the agent must deal, and the length of service." *Id.* (citing RESTATEMENT (SECOND) OF AGENCY § 3 cmt. a).

These factors weigh heavily toward Land Title being CTIC's general agent. Land Title and CTIC were involved in a long-standing relationship; the Agreement had been in force since 1992. Moreover, their relationship was exclusive. Land Title could only issue CTIC's title insurance; it is not licensed to issue insurance on its own. Land Title was appointed only by CTIC and no other insurer, and the Agreement further barred Land Title from issuing assurances by any insurer other than CTIC. On CTIC's end, the insurer conducted no operations in those counties where Land Title sold CTIC insurance policies.

Finally, Land Title created business for CTIC every time it did business with *anyone.* Aside from title insurance, Land Title's only other offering was escrow services, which constituted only 28 percent of Land Title's revenue. Even Land Title's escrow services were sold only in conjunction with title insurance. Thus, every one of Land Title's customers ultimately walked away with a CTIC title insurance policy, whether they bought the insurance directly or were required to purchase it in conjunction with an escrow transaction.

Land Title's agency relationship with CTIC was not a discrete, arm's length contract assignment but involved continuous service. Land Title did no business that

did not result in a sale for CTIC, and within Kitsap, Clallam, Jefferson, and Mason Counties, CTIC did no business other than through Land Title. As far as these four counties were concerned, Land Title was an integrated part of CTIC's operations. Land Title was a general agent of CTIC, and thus under the doctrine of implied authority, could bind CTIC through acts necessary to or customary with those transactions that CTIC authorized.

### B. Unlawful inducements were customary in Land Title's industry

In keeping with the common law, we presume that when a principal gives its agent authority to perform a certain act, the principal also grants implied authority to carry out that act in the usual and customary way. *See Johns,* 67 Wash. at 406. Here, unlawful inducements were the norm in the title insurance industry, CTIC was aware of the pervasiveness of unlawful inducements in the industry, and CTIC took no affirmative steps to stop Land Title from engaging in unlawful inducements. CTIC should have foreseen Land Title's unlawful inducements, and CTIC is vicariously liable for those acts.

In the Washington title insurance industry, vendors of title insurance frequently used unlawful inducements as part of their marketing. Indeed, OIC brought the present enforcement action precisely because unlawful inducements were "widespread and pervasive [and] occur[ring] throughout this industry . . . ." AR at 473-E. CTIC does not challenge OIC's finding that "[the title insurance] industry is rife with practices gone haywire." *Id.* In fact, CTIC itself was directly implicated in numerous transgressions of the anti-inducement laws.

CTIC appointed Land Title as an agent to solicit applications for its title insurance. Because Land Title sold a CTIC insurance policy with *every* transaction it engaged in, it solicited for CTIC's title insurance whenever it did *any* marketing. CTIC cannot have failed to realize that inducements to middlemen were typical in the industry, having engaged in unlawful inducements itself. Yet CTIC did not attempt to dissuade Land Title from engaging in the usual practice of unlawful inducements, outside of boilerplate language in the Agreement. There is no evidence that CTIC exercised its right to investigate Land Title's records or reminded Land Title of its obligation to obey the anti-inducement laws. CTIC cannot now evade liability by willfully blinding itself to Land Title's unlawful marketing practices.

CTIC argues that it would be absurd to apply per se vicarious liability every time a statute used the label "agent." As CTIC points out, the term "agent" appears thousands of times in Washington statutes; for example, RCW 23B.05.010 requires a corporation to register an "agent" for accepting service of process. But we do not suggest that all acts of a process agent should be binding on the corporation. There must be some nexus between the act at issue and the prescribed duties of the agent. As we have explained above, there is clearly such a nexus between soliciting applications for insurance and inducing middlemen to direct end-consumers to an insurer. As we held in *NFRP,* "'solicits' includes inviting, requesting, urging, or advising a person to subscribe to insurance, endeavoring to obtain such a subscription, or approaching a person for the purpose of receiving an application for insurance coverage." 120 Wn.2d at 110-11 (citing *Paulson,* 292 Or. at 62). This definition requires neither that the soliciting party approach the end-consumer, nor

that the insurance application be for the party's own insurance. It clearly encompasses a situation where a UTC approaches a middleman for the purpose of receiving an application (from that middleman's consumers) for insurance coverage (provided by the UTC's parent insurer).

V.    Right To Control

CTIC argues that we should apply the right-to-control test: the principal is accountable for the agent's actions only if the principal had the right to control the details of the agent's performance. *Larner v. Torgerson,* 93 Wn.2d 801, 804-05, 613 P.2d 780 (1980). Right of control is not the only test for vicarious liability. We have generally considered right of control in tort cases, where the agent's negligence is at issue. *See Kamla v. Space Needle Corp.,* 147 Wn.2d 114, 119, 52 P.3d 472 (2002); *Larner,* 93 Wn.2d at 804; *see also* 16 DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 3.12 (2012). The right-to-control test makes sense in the tort context because it is based in the assumption that the agent's act "would be non-tortious if done carefully . . . ." RESTATEMENT (SECOND) OF AGENCY § 250 cmt. b. Here, Land Title's actions were unlawful, not negligent. Land Title did not wine and dine the real estate middlemen by accident. Rather, whether out of overzealousness or ignorance of the law, Land Title engaged in *intentional* conduct that violated the law.

Because the right-of-control test is not a proper fit for every principal-agent situation, the common law treats it as an alternative test that coexists with implied authority. *See* RESTATEMENT (SECOND) OF AGENCY § 8A cmt. b. (master-servant theory is one of two ways to determine inherent agency power); RESTATEMENT

22

(THIRD) OF AGENCY ch. 2 INTRODUCTORY NOTE at 79 (actual authority, apparent authority, and respondeat superior are the "three distinct bases for attribution"). We have already determined that Land Title's unlawful inducements were within the purview of its agency by way of statutory and implied common-law authority. That is enough to establish vicarious liability without any need to engage in a respondeat superior analysis or to determine whether CTIC had the right to control Land Title's actions.

VI.    OIC Did Not Engage in De Facto Rule Making in Violation of the APA and the Washington Constitution

Finally, CTIC argues that the OIC attempted to circumvent the APA's directive that rules be adopted only after notice and the opportunity for comment. An agency may not circumvent the APA by announcing new rules through adjudication. *Budget Rent A Car Corp. v. Dep't of Licensing*, 100 Wn. App. 381, 387-88, 997 P.2d 420 (2000). The OIC responds that the commissioner was simply enforcing a properly promulgated rule pursuant to constitutionally delegated authority. The legislature may delegate rulemaking authority if

> (1) the legislature has set forth guidelines defining in general terms what is to be done and what administrative body or officer is to do it, and (2) adequate procedural safeguards exist to control arbitrary administrative action and the abuse of discretionary power . . . .

*Barry & Barry, Inc. v. Dep't of Motor Vehicles*, 81 Wn.2d 155, 164, 500 P.2d 540 (1972). The legislature delegated broad authority to the commissioner to promulgate rules defining unfair or deceptive trade practices. RCW 48.30.010(2). The rule in the instant case, former WAC 284-30-800, was properly adopted following the statutory

23

notice and comment procedures set forth in RCW 48.30.010 and RCW 34.05.310-.395.

We agree with the OIC. The rule was properly promulgated in accordance with the APA. The current enforcement action against CTIC was simply the commissioner's interpretation and application of the rule. The commissioner did not engage in de facto rule making in violation of the APA and the Washington Constitution.

## CONCLUSION

Former WAC 284-30-800 means what it says: an insurer may not make inducements exceeding $25.00, "directly or indirectly," through its own channels or through an appointed agent that carries sole responsibility for soliciting and effectuating the parent insurer's policies in a locality. We reverse the Court of Appeals and remand for proceedings consistent with this opinion.

No. 87215-5

_Wiggins, J._

WE CONCUR.

_Madsen, C.J._

_Stephens, J._

_González, J._

_Fairhurst, J._

_Chambers, J.P.T._

25

No. 87215-5

J.M. JOHNSON, J. (dissenting)—In Washington State, the freedom of contract is one of our most highly prized liberties. Indeed, impairment of contracts is constitutionally prohibited in article I, section 23 of the Washington Constitution. The simple knowledge that legal contracts will be enforced by the rule of law in courts encourages entrepreneurs to innovate, increasing the quality of life for our citizens. The actions of the Office of the Insurance Commissioner (OIC) and today's majority opinion undermine this bedrock principle. Because the majority fails to respect a business relationship that properly limits vicarious liability, I respectfully dissent.

In this case, two distinct business entities recognized a need for title insurance in rural Washington communities, a need which is in part generated by burdensome insurance regulation. Each entity could supply one of the two necessary components to remedy this title insurance shortage: Land Title Insurance Company has tract indexes to perform the title searches

while Chicago Title Insurance Company (CTIC) has the requisite capital to underwrite the small risk that a title search has been performed incorrectly.[1] CTIC and Land Title entered into a contract that limited the agency relationship and allocated the risk of regulatory noncompliance solely to Land Title.

Business relationships such as the one at issue here thrive on the freedom of contract and often result in lowered costs and increased services for our state's citizens. As long as the business relationship properly limits the scope of agency and leaves open avenues for punishing noncompliance, the OIC should be forced to directly pursue the entity violating the anti-inducement laws.

I would hold that the Washington Insurance Code's provisions for the appointment of agents do not, without more, allow for the imposition of vicarious liability for regulatory violations. Instead, agencies and courts

---

[1] Under the Washington Insurance Code, a title insurer that does not have a title plant in a given county must rely on a title agent that owns or leases a title plant in order to transact business in that county. Administrative Record (AR) at 469 (Decl. Tompkins ¶ 4). A title insurer must also maintain a minimum amount of capital stock and surplus. RCW 48.29.020(3); RCW 48.05.340. For these reasons, large title companies often underwrite policies issued by small title companies in rural areas. The underwritten companies are referred to as "independent agents" or "underwritten title companies" (UTCs). The insurance code requires title companies in such arrangements to appoint UTCs as their agents, file the appointment with the commissioner, and notify the commissioner if the appointment is ever revoked. RCW 48.17.160.

2

must turn to common law agency principles to determine whether vicarious liability is appropriate. Where, as here, an entity does not have a right to control the aspect of the other entity's business under which the regulatory violation occurred, the commissioner may not impose vicarious liability. I would remand to the OIC with instructions to enter an appropriate final order.[2]

ANALYSIS

The Washington Insurance Code is silent as to the general scope of agency and, in particular, vicarious liability. Thus, common law principles of agency are necessary to determine whether vicarious liability is appropriate. Pursuant to the entities' agreement, CTIC has no right to control the marketing practices of its appointed agent, Land Title. For this reason, CTIC cannot be held vicariously liable for Land Title's violations of the illegal inducement regulation.

The use of the term "agent," without more, cannot create per se liability. *Kroshus v. Koury*, 30 Wn. App. 258, 263, 633 P.2d 909 (1981)

_____

[2] The relief granted by the Court of Appeals was improper because it was not available under the Administrative Procedure Act, chapter 34.05 RCW. *See Chi. Title Ins. Co. v. Wash. State Office of Ins. Comm'r*, 166 Wn. App. 844, 858, 271 P.3d 373 (2012); *see also* RCW 34.05.570, .574(1), .464(7). Accordingly, instead of affirming the Court of Appeals, I would remand to the OIC with instructions to enter an appropriate final order. Although the procedural routes are different, the result is substantively similar to affirming the Court of Appeals.

3

(concluding that the label "employee" or "agent" does not create per se vicarious liability). Furthermore, Land Title does not have implied authority to market on CTIC's behalf. While former RCW 48.17.010 (1985) defines an agent as "any person appointed by an insurer to solicit applications for insurance on its behalf," our precedent recognizes the unique relationship between an underwritten title company (UTC) and an insurer. In *First American Title Insurance Co. v. State, Dep't of Revenue*, 144 Wn.2d 300, 304, 27 P.3d 604 (2001),[3] we noted that the activities of title insurers and UTCs are separate business services. We recognized that "'[The UTC] generates business for its own account. It places the relatively small insurance component with an insurer qualified, by reason of compliance with financial requirements, to underwrite the slight risk that [the UTC] has not properly done its work.'" *Id.* (alterations in original) (quoting *Fid. Title Co. v. Dep't of Revenue*, 49 Wn. App. 662, 669-70, 745 P.2d 530 (1987)). We further noted that "a UTC is not a mere insurance agent or broker, but rather generates business for its own account." *Id.* at 305. Although UTCs

---

[3] Footnote 1 of *First American Title* indicates that sometimes the statutory scheme will fully dispose of the agency issue, eliminating the need for a common law analysis. However, where, as here, the statutory scheme does not define the scope of agency and, in particular, provide for vicarious liability, a common law analysis is necessary. 144 Wn.2d at 304 n.1.

4

are required to be registered as an appointed agent of the underwriting company, our precedent firmly establishes the separateness of the two entities. Where, as here, marketing is done by the UTC on its own behalf, former RCW 48.17.010 does not establish implied authority.

"Agent" has been defined in the insurance code for the past 100 years,[4] and courts have continued to apply common law agency principles to determine the appropriateness of vicarious liability. In *Miller v. United Pacific Casualty Insurance Co.*, 187 Wash. 629, 60 P.2d 714 (1936), we established the existence of the agency relationship through the insurance code and then went on to analyze common law agency principles to determine whether the agent's acts could bind the insurer. *Id.* at 636. In determining the appropriateness of vicarious liability, a court may look to the statutory agency relationship. However, particularly if the statute is silent as to the scope of agency, an analysis of common law principles is necessary.

*American Fidelity & Casualty Co. v. Backstrom*, 47 Wn.2d 77, 287 P.2d 124 (1955), followed *Miller*'s lead. Both cases quoted from 2 *Floyd R. Mechem, A Treatise on the Law of Agency* (2d ed. 1914) in using the

---

[4] *See Day v. St. Paul Fire & Marine Ins. Co.*, 111 Wash. 49, 51-52, 189 P. 95 (1920).

common law of agency to determine whether the agent's actions fell within the scope of agency. *Am. Fid.*, 47 Wn.2d at 82; *Miller*, 187 Wash. at 639. *American Fidelity* also quoted from the first *Restatement of Agency. Am. Fid.*, 47 Wn.2d at 83. In this way, both *American Fidelity* and *Miller* relied on common law agency principles, not solely the statutory definition of "agent" to determine the scope of the agency relationship.

Right To Control

Under common law principles, an agent's actual authority can be implied or express. *King v. Riveland*, 125 Wn.2d 500, 507, 886 P.2d 160 (1994). The main consideration for actual authority is the right to control. *Hollingbery v. Dunn*, 68 Wn.2d 75, 80, 411 P.2d 431 (1966). Whenever superior and subordinate business parties enter into a relationship, the relationship is either one of master and servant or one of independent contractor. *Larner v. Torgerson*, 93 Wn.2d 801, 804, 613 P.2d 780 (1980). "An independent contractor . . . may be generally defined as one who contractually undertakes to perform services for another, but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in performing the services." *Hollingbery*, 68 Wn.2d at 79-80. "When a superior business party has retained no right of control and there is no reason to infer a right of control over a subordinate business

6

party, then he cannot be held liable for the negligent acts of the subordinate party." *Larner*, 93 Wn.2d at 804-05.

This common law right to control analysis allows contracting entities to choose the structure, with the attendant liability, which best suits their needs. The decision regarding which party should retain the risk of liability or regulatory noncompliance is often complex. It can include factors such as which party is in a better position to obtain insurance, and the party retaining the risk of liability is generally compensated through higher remuneration or better terms. The right to control principle is critical to the freedom of contract. Business liability is not "one size fits all," governed exclusively by statute and subject to second guessing by courts.

Here, Land Title and CTIC contractually entered an independent contractor relationship, allowing Land Title to retain its own risk of regulatory noncompliance. Governed by their agreement, Land Title accepts and processes applications for title insurance and issues policies underwritten by CTIC. The agreement provides that Land Title "shall not be deemed or construed to be authorized to do any other act for principal not expressly authorized herein." Administrative Record (AR) at 519. The agreement prohibits Land Title from using CTIC's name in its advertising, other than to indicate its authority to issue policies underwritten by CTIC.

7

AR at 520. CTIC does not have input in or oversight of Land Title's marketing practices. AR at 499 (Decl. Kennedy ¶ 9). CTIC simply underwrites the risk for title policies issued by Land Title in exchange for 12 percent of the policy premium. AR at 517 (Decl. Randolph ¶ 8). We should respect the entities' independent contractor relationship, recognizing that CTIC does not have the right to control Land Title's marketing practices. Because there is no statutorily defined agency relationship, or actually authority (express or implied), it is improper to impute Land Title's noncompliance with the anti-inducement laws to CTIC.

The majority asserts that "the purpose of the statute would be defeated if an insurer could gain the benefits of appointing an agent (here, the ability to sell insurance in a locale where it lacks a title plant) while 'waiving' any attendant liability through contract." Majority at 14. However, there is nothing resembling waiver here. Instead, Land Title and CTIC have chosen a specific allocation of risk between them, with Land Title maintaining full liability for its own regulatory noncompliance. In fact, the two companies

have allocated the risk of regulatory noncompliance in the most efficient way possible. In this situation, Land Title is the cheapest cost avoider.[5]

Here, Land Title's management is in the best position to monitor the company's marketing practices for compliance with the anti-inducement laws. Oversight by CTIC would most certainly result in unnecessary administrative costs. Therefore, the most efficient allocation of risk for noncompliance is to avoid vicarious liability and hold Land Title responsible for its own violations. This is the best way to incentivize compliance with the least transaction costs.

While minimizing the cost of oversight, the agreement simultaneously aligns Land Title's incentives to comply with the law.[6] All of this is achieved without impermissibly "waiving" liability. Instead of imputing

---

[5] The terms "cheapest cost avoider" and "least cost avoider" are interchangeable. It is a concept first developed by law and economics scholars such as Ronald Coase and Guido Calabresi. "A pure market approach to primary accident cost avoidance would require allocation of accident costs to those acts or activities (or combinations of them) which could avoid the accident costs most cheaply." GUIDO CALABRESI, THE COSTS OF ACCIDENTS: A LEGAL AND ECONOMIC ANALYSIS 135 (1970). For example, if we assume that pedestrians are in a better position to avoid car accidents than drivers (by not darting into the street without looking), we should assign liability for accidents to pedestrians. Having to bear the risk of an accident incentivizes looking both ways before crossing the street. Although generally used in the tort context, this principle is also applicable to regulatory compliance.

[6] The majority notes, "There is no evidence that CTIC exercised its right to investigate Land Title's records or reminded Land Title of its obligation to obey the anti-inducement laws." Majority at 20-21. This type of inefficient oversight is precisely what the entities sought to avoid by allocating the risk of noncompliance solely to Land Title.

liability to CTIC, Land Title is responsible for its own noncompliance. If OIC wishes to fine an entity for Land Title's noncompliance, it is free to do so. It must simply go after Land Title directly.

I see no wisdom in this court second-guessing efficient and effective business relationships that leave open avenues for punishing regulatory or statutory noncompliance. This court's decision will likely result in the reduced availability of title insurance in rural Washington counties. Shortages of reasonably priced title insurance will most certainly hurt consumers more than offering a free game of golf to their real estate agents.

It is difficult to understand that this statewide elected insurance commissioner holds nothing more important to Washington insured citizens than the de minimis golf games or baseball tickets underlying this case—with the expenditure of thousands of dollars in attorney fees, most funded by taxpayers.

Because their contractual relationship bars CTIC from having any control over Land Title's marketing practices, it is improper to impute Land Title's liability for regulatory noncompliance to CTIC. I, therefore, dissent.