IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| JAMES W. CHERBERG and NAN CHOT CHERBERG, husband and wife,<br><br>           Appellant,<br><br>           v.<br><br>FIDELITY NATIONAL TITLE INSURANCE COMPANY,<br><br>           Respondent. | No. 85749-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — Fidelity National Title Insurance Company (Fidelity) sold James Cherberg and Nan Chot Cherberg (the Cherbergs) a title insurance policy (the Policy) on waterfront property the Cherbergs had just purchased. At the time of sale, two publicly recorded easements encumbered the property limiting the Cherbergs' waterfront access, but the Policy did not identify these two easements. The Cherbergs brought suit against Fidelity for breach of the Policy and other claims.

The superior court granted Fidelity's motion for summary judgment, finding there was no genuine issue of material fact that the Cherbergs failed to cooperate with Fidelity's pre-coverage investigation of their claim. Specifically, the court

agreed with Fidelity that the Cherbergs had knowledge of the two easements, but failed to disclose that information to Fidelity. The court also denied the Cherbergs' motion for summary judgment, brought on the merits of their claims.

We affirm the court's denial of the Cherbergs' motion, but hold there is a genuine issue of material fact as to whether they cooperated with the investigation and as to the nature of their knowledge of the two easements. Thus, we reverse the superior court's order granting summary judgment in favor of Fidelity, and remand this matter for further proceedings consistent with this opinion.

I.      BACKGROUND

A.      The Cherbergs Purchase Property and a Policy from Fidelity

In February 2012, Hal and Joan Griffith (the Griffiths) lived on the waterfront on Mercer Island and purchased the property next-door, also on the waterfront, from their neighbors, the Dunns. Before the purchase, the Griffiths and Dunns shared a dock adjacent to the Dunns' property through a "Joint Dock Use Agreement." Through their purchase, the Griffiths sought to secure exclusive use of this dock and the rights necessary to maintain and fully access the dock.

The Griffiths did so by creating and publicly recording two easements in May 2012. First, they established an "Exclusive Landscape Easement," which conveyed in perpetuity, for the benefit of their original parcel, a portion of the Dunns' former property for landscaping, access, and irrigation. Second, they established an "Exclusive Dock Easement," which replaced the above-mentioned Joint Dock Use Agreement, and which conveyed in perpetuity, for the benefit of their original parcel, exclusive use of the existing dock, as well as access over,

under and across a portion of the Dunns' former property and its waterways for ingress or egress from the dock. Hereinafter, we will refer to the easements collectively as the "Exclusive Easements." As the Cherbergs later described them, the Exclusive Easements ensured the dock and "half the waterfront portion [of the Dunn property] would be off limits to" future owners.

On June 5, 2012, the Cherbergs and Griffiths entered into a "Purchase and Sale Agreement" (PSA) for the Dunns' former property (hereinafter, the Cherberg property). The closing date of the PSA was June 30, 2012. An addendum to the PSA states:

> Sellers [the Griffiths] hereby agree to assist Buyers [the Cherbergs] in their effort to obtain a dock permit. They agree not to challenge in any way the Buyers solicitation of said permit.
>
> Sellers hereby agree to allow Buyers to encroach into the normal 35 foot setback between docks ~~to no closer than 25 feet~~.[1] This may entail changing *the easement which is in place regarding the landscape* on the Western most property along the waterfront. Sellers agree to cooperate with Buyers in order to obtain a permit for a dock along the Western line of the property.[2]

(Emphasis added). The PSA did not mention that there were *two* easements or identify by their formal names or by their county instrument recording numbers, attach, or otherwise explicitly reference the Exclusive Easements.

---

[1] In the PSA addendum, the Griffiths struck the clause "to no closer than 25 feet" prior to executing the agreement. This revision does not appear relevant to the present dispute, and we discuss it no further.

[2] A handwritten addition to the PSA addendum states the "Seller hereby discloses that they are currently in the process of legally describing an easement for landscaping through adverse possession with [another neighbor] on the southside of the property. From the date of closing the Buyers agree to assume all financial obligations to complete the agreement." Two signatures dated June 6, 2012 appear on this handwritten addition. As this addendum does not appear relevant to the present dispute, we discuss it no further.

On June 29, 2012, the Cherbergs purchased the Policy from Fidelity covering their newly purchased property. Fidelity does not dispute that the Policy failed to expressly identify, "take exception to," or "otherwise disclose the existence of" the Exclusive Easements.

Two provisions of the Policy are most relevant. First, Exclusion 3(a) states:

> The following matters are expressly excluded from the coverage of this policy, and the Company [Fidelity] will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of . . . Defects, liens, *encumbrances*, adverse claims, or other matters . . . created, suffered, *assumed*, *or agreed* to by the Insured Claimant [the Cherbergs].

(Emphasis added.) Second, Condition 6(b), titled "DUTY OF INSURED CLAIMANT TO COOPERATE," states:

> This Company may reasonably require the Insured Claimant to submit to examination under oath by any authorized representative of the Company and to produce for examination, inspection, and copying, at such reasonable times and places as may be designated by the authorized representative of the Company, *all records,* in whatever medium maintained, including books, ledgers, checks, memoranda, correspondence, reports, e-mails, disks, tapes, and videos whether bearing a date before or after Date of Policy, *that reasonably pertain to the loss or damage.* Further, if requested by any authorized representative of the Company, the Insured Claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect, and copy all of these records in the custody or control of a third party that reasonably pertain to the loss or damage.

(Emphasis added.)

In June 2013, the Cherbergs tendered a claim to Fidelity, notifying it that the Exclusive Easements were not disclosed and that "an adverse claim of interest may cause loss or damage." They alleged the "non-disclosed easements" caused "damages in an undetermined amount," including "loss of property value, additional

4

costs for construction, and hiring consultants."

Fidelity corresponded with the Cherbergs' attorney, Charles Klinge, over the following months. This correspondence included Fidelity's October 2013 inquiry regarding the Cherbergs' knowledge of the Exclusive Easements, where Fidelity asked, "[p]lease also confirm whether it is the Cherbergs' understanding that the landscape easement and the dock easement referred to in the [PSA] addendum are distinct from the recorded easements." In December 2013, Klinge responded to this inquiry, stating "[a]t the time of the [PSA], the Cherbergs were not aware of the previously recorded Easements that were not disclosed in the title report."

In December 2013, Fidelity notified the Cherbergs by letter that it determined "the claim is afforded coverage subject to the terms and conditions of the above Policy and the below reservation of rights." Further, in a November 2014 email, Fidelity stated that, "since the Company is authorizing the litigation be initiated on behalf of the insureds" against the Griffiths regarding the Exclusive Easements, "the Company will be responsible for any attorney's fees that the court ordered against the Insureds [i.e., the Griffiths]."

B. The Cherbergs Through Fidelity File Suit Against the Griffiths

In May 2015, the Cherbergs filed suit against the Griffiths, bringing claims to quiet title, of ejectment, for breach of the PSA, and negligent misrepresentation. The following month, the Griffiths answered and filed various counterclaims.

In June 2015, Fidelity reserved its rights under Exclusion 3(a) for the first time, explaining that, "[s]hould it be discovered in the course of litigation that Insureds agreed or consented to the Easements or should the [Griffiths']

allegations be proved, paragraph 3(a) of the Exclusions from Coverage would absolve the Company of any obligation it otherwise might have to indemnify the Insureds for any loss suffered as a result." Fidelity's letter alluded to the PSA addendum's reference to an "easement . . . regarding the landscape." In summarizing its position, Fidelity stated that it would "continue to engage counsel to prosecute the action on behalf of the Insureds but will not be liable for any damages resulting from the [Griffiths'] structures being situated outside the Easement area, and will withdraw coverage should it be discovered that the Insureds consented or agreed to the Easements."

Both sides subsequently moved for summary judgment. On April 1, 2016, the superior court granted the Griffiths' summary judgment motion in part and held "the Griffiths did not negligently misrepresent by omission the existence of the easements because the Cherbergs were on notice of the easements." "Specifically, the Court finds that both the Griffiths' recording of the easements and disclosure of the easements to the Cherbergs by their realtor put the Cherbergs on notice of the easement." This latter finding is in reference to a pre-closing property inspection the Cherbergs had with their real estate agent, Kris Robbs. There, Robbs reportedly told the Cherbergs "[h]e maintains this, you maintain that," and James Cherberg testified he interpreted that to mean the Griffiths maintained part of the landscape on the property.

That same day, the court also granted the Cherbergs' motion for partial summary judgment and found the Griffiths "breached the Parties' [PSA] by challenging the [Cherbergs'] efforts to permit a dock" and "by refusing to sign a

6

Joint Use Agreement." Thus, the court also granted the Cherbergs' "[m]otion for specific performance."

C.     Fidelity Withdraws Coverage and the Cherbergs Complete their Suit against the Griffiths and File Suit Against Fidelity

A few weeks later, Fidelity informed the Cherbergs that "there is ample evidence [they] knew of the Easements and their impact prior to closing and purchased the Property nonetheless," meaning "coverage for the claim is excluded pursuant to paragraph 3(a) of the Exclusions from Coverage to the Policy and [Fidelity] has no duty of defense or indemnity to" them.

After Fidelity withdrew coverage, the Cherbergs completed litigating their suit against the Griffiths, including two appeals before this court. Cherberg v. Griffith, No. 75276-6-I, slip op. at 12 (Wash. Ct. App. Nov. 20, 2017) (unpublished) https://www.courts.wa.gov/opinions/pdf/752766.pdf (hereinafter, Cherberg I); Cherberg v. Griffith, No. 81482-6-I, slip op. at 1 (Wash. Ct. App. Sept. 20, 2021) (unpublished) https://www.courts.wa.gov/opinions/pdf/814826.pdf (hereinafter, Cherberg II).

In short, this court reversed the April 2016 order granting the Cherbergs summary judgment, and the parties tried their dispute in a bench trial in June 2019. The court found the Griffiths breached the PSA and ordered specific performance. The Griffiths then unsuccessfully appealed that judgment. Cherberg II, No. 81482-6-I, slip op. at 1.

In August 2021, the Cherbergs tendered another claim to Fidelity under the Policy. They claimed the King County Assessor had decreased their property value by $929,000 due to the Exclusive Easements. Fidelity again denied

coverage, explaining that, "[b]ecause coverage is not afforded for the Easements themselves, coverage is likewise not afforded for any alleged diminution in value to the Property due to, or tax effects on the Property of, the Easements."

The Cherbergs filed suit against Fidelity, and both sides filed cross motions for summary judgment. In October 2022, the Cherbergs filed two summary judgment motions. The Cherbergs' first summary judgment motion alleged Fidelity acted in bad faith and violated both the Insurance Fair Conduct Act (IFCA), RCW 48.30.015, and the Consumer Protection Act (CPA), chapter 19.86 RCW. In that motion, the Cherbergs further sought summary judgment that Fidelity's reservation under Exclusion (3)(a) was untimely and that Fidelity had improperly withdrawn its coverage of the Cherberg-Griffith suit. The Cherbergs' second summary judgment motion alleged Fidelity breached the Policy by improperly relying on Exclusion 3(a).

In March 2023, Fidelity moved for summary judgment. Fidelity denied that it breached the Policy as Exclusion 3(a) permitted withdrawal as "the policy claimants (i.e. the Cherbergs) not only knew of, accepted, and consented to the Easements, they also understood the impacts of the Easements, and took specific actions to alleviate those impacts." Further, Fidelity claimed it defended "until all the title claims were dismissed and not appealed" as the "only claim left after the 2016 summary judgment was the defense of the PSA Appeal, an undisputedly non-covered claim, which concerned the placement of the Cherbergs' dock." Fidelity also argued that, because the Griffiths both provided compensation to and were required to cooperate with the Cherbergs, the Cherbergs' "claims fail for want

8

of damages or causation."

Fidelity's motion also sought to dismiss the Cherbergs' claims of bad faith and violations of IFCA and the CPA. Notably, Fidelity also argued that the Cherbergs violated Condition 6(b) as the "Cherbergs made material omissions and misrepresentations throughout the claims process and this litigation" regarding their knowledge of the two easements. In other words, Fidelity asserted a "noncooperation defense."

In June 2023, the superior court granted Fidelity's motion for summary judgment and denied the Cherbergs' motions for summary judgment. The superior court first concluded there was no genuine issue of material fact that the "Cherbergs failed to cooperate with Fidelity during the claims process by withholding information material to the Company's investigation and made material misrepresentations to the Company, thereby prejudiced the Company during that process," which "precludes coverage and bars the Cherbergs' claims in this suit." Further, the court held that "the undisputed evidence demonstrates the Cherbergs consented to the easement" and such consent "triggered Exclusion 3(a)."

The superior court secondarily held that the "Cherbergs' claims for breach of contract and bad faith additionally fail for want of causation and evidence supporting their asserted personal and economic injuries," (inaccurately) stating that the Cherbergs had only "reserved" on that issue. For the same reasons, the court additionally dismissed the Cherbergs' claims of violations of IFCA and the CPA. The court also denied the Cherbergs' request for attorney fees. The

9

Cherbergs unsuccessfully moved for reconsideration[3] and now appeal.

II.    ANALYSIS

A.    Overview of Title Insurance

"Title" is "the legal right to control and dispose of property" or "the legal link between a person who owns property and the property itself." BLACK'S LAW DICTIONARY, 1793 (12th ed. 2024). Thus, title insurance "protects the insured against loss arising from a defect in title to real property." Id. at 956.

"Typically, insurance protects against a contingency that might occur in the future, such as a fire or flood." Chi. Title Ins. Co. v. Office of Ins. Com'r, 178 Wn.2d 120, 125, 309 P.3d 372 (2013). However, "[t]itle insurance is different—it protects against *past* claims against the insured real estate, such as forged signatures on transfer documents, unpaid real estate taxes, and liens that cloud title on the property." Id. In other words, "[b]y paying consideration to a title insurer for their expert services in uncovering defects in title, it is reasonable for the insured to believe and rely upon the fact that the insurer has discovered any encumbrances recorded in the public record." C 1031 Props., Inc. v. First Am. Title Ins. Co., 175 Wn. App. 27, 32, 301 P.3d 500 (2013).

"Title insurance is also special in that it is purchased as part of the closing of a real estate transaction." Chi. Title Ins. Co., 178 Wn.2d at 127. "In many cases, consumers have little real opportunity to shop around or to make an informed

---

[3] The Cherbergs appealed both the court's summary judgment order and its order denying reconsideration. However, the Cherbergs' appellate briefing presents no argument specifically on the motion for reconsideration and thus we need not consider it. Brown, 169 Wn.2d at 336 n.11.

decision about what title insurance policy to buy" and simply "buy title insurance from whomever a real estate agent, bank, or other major party to the transaction recommends."  Id.

B.      Summary Judgment Standard

We review de novo whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  CR 56(c); see Ranger Ins. Co. v. Pierce County, 164 Wn.2d 545, 552, 192 P.3d 886 (2008).  "'A material fact is one upon which the outcome of the litigation depends in whole or in part.'"  Heston v. Christensen, 30 Wn. App. 2d 511, 516, 548 P.3d 961 (2024) (quoting Atherton Condo. Apt.-Owners Ass'n Bd. of Dirs. v. Blume Dev. Co., 115 Wn.2d 506, 516, 799 P.2d 250 (1990)).  "A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation."  Ranger Ins. Co., 164 Wn.2d at 552.

We "must construe all facts and inferences in favor of the nonmoving party."  Id.  The "'function of a summary judgment proceeding, or a judgment on the pleadings is to determine whether or not a genuine issue of fact exists, not to determine issues of fact.'"  Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 217, 522 P.3d 80 (2022) (quoting State ex rel. Zempel v. Twitchell, 59 Wn.2d 419, 425, 367 P.2d 985 (1962)).  As such, the superior court "may not weigh the evidence, assess credibility, consider the likelihood that the evidence will prove true, or otherwise resolve issues of material fact."  Id.

11

"When parties file cross motions for summary judgment, questions of law determine the outcome *if* there are no genuine issues of material fact." Michel v. City of Seattle, 19 Wn. App. 2d 783, 789, 498 P.3d 522 (2021) (emphasis added).

For appeals of summary judgment orders involving title insurance policies, "our duty is to interpret the policy exclusion language and apply that interpretation to the undisputed case facts." C 1031 Props. Inc., 175 Wn. App. at 33.

"We may affirm a trial court's decision on a motion for summary judgment on any ground supported by the record." Port of Anacortes v. Frontier Indus., Inc., 9 Wn. App. 2d 885, 892, 447 P.3d 215 (2019).

C.      Fidelity's Motion for Summary Judgment

Again, the Cherbergs appeal both the trial court's order granting Fidelity's motion for summary judgment and denying theirs. We address each in turn.

The superior court granted summary judgment in favor of Fidelity based on its noncooperation defense. Under a noncooperation defense, "[i]nsureds may forfeit their right to recover under an insurance policy if they fail to abide by provisions in the policy requiring them to cooperate with the insurer's investigation of their claim." Tran v. State Farm Fire & Cas. Co., 136 Wn.2d 214, 224, 961 P.2d 358 (1998).

Our Supreme Court created a three-element test for noncooperation defenses. Id. at 224-25, 228. "The burden of proving noncooperation is on the insurer." Staples v. Allstate Ins. Co., 176 Wn.2d 404, 410, 295 P.3d 201 (2013); Pilgrim v. State Farm Fire & Cas. Ins. Co., 89 Wn. App. 712, 720, 950 P.2d 479 (1997).

First, the "insurer's request for information must be *material* to the circumstances giving rise to liability on its part." Tran, 136 Wn.2d at 224 (emphasis added). "Information is material when it 'concerns a subject relevant and germane to the insurer's investigation that was then proceeding' at the time the inquiry was made." Id. (quoting Fine v. Bellefonte Underwriters Ins. Co., 725 F.2d 179, 183 (2d Cir. 1984)).

Second, we gauge "whether [the insured] *substantially complied* with [the insurer's] requests." Id. (emphasis added). For substantial compliance, we "must first look to the relevant policy language." Id. at 225. "The question is whether [the insured] responded to Insurers' requests" that were "material to the . . . investigation and claim." U.S. Fire Ins. Co. v. Icicle Seafoods, Inc., 572 F. Supp. 3d 1047, 1062 (W.D. Wash. 2021).

Third and finally, the "insurer [must be] *actually prejudiced* by the insured's breach." Tran, 136 Wn.2d at 228 (emphasis added). "Interference with the insurer's ability to evaluate and investigate a claim *may* cause actual prejudice." Id. (emphasis added). The court explained that "[c]laims of actual prejudice require 'affirmative proof of an advantage lost or disadvantage suffered as a result of the [breach], which has an identifiable detrimental effect on the insurer's ability to evaluate or present its defenses to coverage or liability.'" Id. at 228-29 (quoting Canron, Inc. v. Federal Ins. Co., 82 Wn. App. 480, 491-92, 918 P.2d 937 (1996)). In other words, if "insurers are inhibited in their effort to process claims due to uncooperativeness of the insured, they suffer prejudice." Id. at 231. Otherwise, "we would be encouraging insureds to not cooperate and submit fraudulent

13

claims." Id. That said, the court cautioned that "prejudice is an issue of fact and will seldom be established as a matter of law." Id. at 228. And the "insurer has the burden of proving . . . prejudice."[4] Id.

Applying the above framework, the court in Tran affirmed summary judgment in favor of the insurer based on a noncooperation defense. Id. at 232-33. Notably, the court held the insured did not substantially comply with the insurer as he "failed to provide . . . *any* documentation at the time he made his claim" and "later failed to provide [the insurer] with supporting documentation for *all* of the items that he claimed were stolen." Id. at 226 (emphasis added). Further, the court noted that the insured had "provided the police and [the insurer] with differing stories." Id. at 227.

The U.S. District Court for the Western District of Washington also applied Tran when affirming summary judgment in favor of the insurer based on a noncooperation defense in Icicle Seafoods, Inc., 572 F. Supp. 3d at 1059-60. As to the second element, substantial compliance, the court found that the insured failed to "cite to *any* evidence in support" of its argument that "it produced 'troves of documents' and 'access to . . . financial data.'" Id. at 1062 (emphasis added).

We address each element in turn.

1. Materiality

---

[4] The Cherbergs cite to a New York case holding that the insurer must also show as part of its noncooperation defense that the insured engaged in "'willful and avowed obstruction.'" Emigrant Mortgage Co. v. Wash. Title Ins. Co., 78 A.D.3d 1112, 1114, (2d. Dept. N.Y. 2010) (quoting Thrasher v. U.S. Liab. Ins. Co., 19 N.Y.2d 159, 168 (1967)). However, the Cherbergs offer no binding Washington authority which has adopted this standard. We decline to add to our Supreme Court's three-element test.

Fidelity argues that there is no genuine issue of material fact that, *if* the Cherbergs had knowledge of the Exclusive Easements, that fact would be material to its investigation as it "broadly asked for all information concerning the Cherbergs' knowledge as it pertained to the easements . . . and did so to obtain a 'complete understanding of the facts and circumstances' regarding the Cherbergs' 'claim.'"

The Cherbergs appear to concede that "[w]hat the Cherbergs knew pre-closing is material to Exclusion 3(a)," but argue (1) that "what the trial court and Fidelity ignored is that Fidelity itself had the *very same* information, before closing, in the PSA" and (2) "Jim Cherberg's sole pre-closing knowledge apart from the Addendum was of a landscape easement limited to maintenance."

The Cherbergs' first argument conflates materiality and prejudice, as the court in <u>Tran</u> made clear that undisclosed information need only be "'relevant and germane'" to the claim to be material, as opposed to having no "'detrimental effect'" on Fidelity's investigation. 136 Wn.2d at 224 (quoting <u>Fine</u>, 725 F.2d at 183), 228-29 (quoting <u>Canron, Inc.</u>, 82 Wn. App. at 491-92). The court created no requirement that such information must also be non-duplicative. The Cherbergs' second argument fails for the same reason because—while the scope of their knowledge may matter for other questions (such as those discussed below)—the acknowledgement that they knew something about an easement meets the low threshold for materiality. We hold the Cherbergs failed to establish a genuine issue of material fact as to the materiality element.

2. Substantial Compliance

Next under <u>Tran</u>, we "must first look to the relevant policy language." 136 Wn.2d at 225.

Condition 6(b) of the Policy broadly states an insured may be required to "to produce for examination, inspection, and copying . . . *all* records . . . that reasonably pertain to the loss or damage." This condition is similar to the policy in <u>Tran</u> which warned the insured could be questioned about "any matter" related to the claim or be required to submit records to prove the loss. 136 Wn.2d at 225.

Fidelity argues that there is no genuine issue of material fact that the Cherbergs failed to "substantially compl[y] with Fidelity's requests for material information by fully and accurately describing what they knew about the easements." Fidelity's motion for summary judgment proffered various past oral or written statements to or by the Cherbergs to establish the predicate fact that they knew about the Exclusive Easements, including:

- Correspondence with his attorney, Klinge, including:
  - A June 2012 email from Klinge to James Cherberg that advised him to obtain "disclosure of new easement for Seller's dock and proposed new lateral line."
  - Various emails in March 2013 between the Cherbergs and Klinge which referenced an "easement" and the potential of a claim against Fidelity.
  - A July 2013 email between James Cherberg and his attorney in which states he had "'some sort of knowledge', from Kris Robbs" that the Griffiths "had an easement to maintain the outcrop area, but no mention of the severity of the restriction to me."
- Discussions with their realtor, Robbs that the Griffiths "maintain[] this, [Cherbergs] maintain that" and, as memorialized in James Cherberg's handwritten notes dated August 7, 2012, that Robbs said it was "'[b]etween you and [the Griffiths] how easement will be changed.'"
- Discussions with their dock builder, Ted Burns, where they stated they understood Klinge's warnings regarding the easement but wanted to move forward anyway.

From this, Fidelity argues that, "[w]hen Fidelity accepted coverage in 2013,

the Cherbergs had not provided Fidelity with *any* of the above-cited correspondence or other information about the disclosures made prior to the sale, despite Fidelity's express request" and, instead, "the Cherbergs, through their counsel, expressly disclaimed any knowledge of the Easements."

We hold that "reasonable minds could differ on the facts" concerning the Cherbergs' alleged knowledge of the Exclusive Easements and, in turn, their cooperation with Fidelity's investigation. Ranger Ins. Co., 164 Wn.2d at 552. Again, we "must construe all facts and inferences in favor of the nonmoving party," here, the Cherbergs, and Fidelity bears the burden of proving noncooperation. Id.; Staples, 176 Wn.2d at 410. We hold Fidelity did not carry its burden for at least three general reasons.

First, in none of the correspondence or statements referenced above did the Cherbergs or others unequivocally reference the existence of the Exclusive Easements. Indeed, like the PSA addendum itself, none of this evidence (a) includes any allusion to *two* easements or (b) identifies by their formal names or by their county instrument recording numbers, attaches, or otherwise explicitly references the Exclusive Easements. Instead, again like the PSA itself, this evidence references at most merely a singular easement, sometimes with reference to a landscaping arrangement, and sometimes with no explanation at all about the nature of the easement. The Exclusive Easements, in fact, granted the Griffiths unlimited and exclusive access through, over, and even under half of the Cherbergs' waterfront property and waterways needed for use of the dock, in perpetuity no less. A reasonable juror could find that the evidence above does not

17

establish that the Cherbergs had knowledge of such sweeping limitations on their new property.[5]

Second, the Cherbergs put forth specific evidence supporting their claim they were ignorant of the Exclusive Easements. For example, in his January 2016 deposition, James Cherberg confirmed that, at the pre-closing inspection, Robbs told him "'[Griffiths] maintain[] this, you maintain that,'" but he further testified that he "had no reason to believe that there was any such document [i.e., easement] in existence." Cherberg explained under oath that he "figured if [the Griffiths] wanted to maintain my property and keep the trees pruned, to not block their view, it would actually be benefitting me and not block my view as well." Fidelity effectively asks us to discount these statements, which we could only do if we ourselves assessed James Cherberg's credibility. Such an assessment is not appropriate at this stage of the proceedings as it invades the province of the jury. Haley, 25 Wn. App. 2d at 218 ("Our summary judgment standard precludes resolution of issues of material fact because our constitution protects the right to have factual issues decided by a jury.").

Third, even if we assumed arguendo that Fidelity had established there is no genuine issue of material fact as to the Cherbergs' knowledge of both Exclusive Easements, the related outstanding question is whether there is no genuine issue

---

[5] The superior court "found" that, for their breach of contract claim to fail, "it is not necessary that the Cherbergs knew all of the impacts of the easements, as long as they knew some of them." The court cited to no authority for this conclusion. And, more substantively, a reasonable juror could believe that the Cherbergs could not know the "impacts" of even "some of the easements" unless Fidelity first could establish it is undisputed that the Cherbergs knew about the existence of the actual legal instruments in the first place.

of material fact that the Cherbergs failed to cooperate with Fidelity's investigation by failing to provide this information to it.

Fidelity argues Icicle Seafoods involved a "virtually identical situation" as the present appeal because, as the court there held, "an absence of substantial compliance is established if in litigation an insured's document production contains information an insurer requested but was not provided during its claim investigation." (Citing Icicle Seafoods, 572 F. Supp. 3d at 1062). We disagree.

The present appeal is distinguishable from Icicle Seafood and other binding precedent. The binding precedent reviewed above involved "extreme" examples where the insured "stonewalled" and outright refused to turn over any or nearly any records. Icicle Seafoods, 572 F. Supp. 3d at 1062 (refusal to turn over "any evidence"); Tran, 136 Wn.2d at 226 (failure to provide "any documentation"); Staples, 176 Wn.2d at 420 (describing these cases as "stonewall[ing]" and "extreme"); Pilgrim, 89 Wn. App. at 722 ("[N]o reasonable juror could conclude that the Pilgrims substantially cooperated in the production of relevant, reasonable, requested financial documents. With the exception of their W-2's, *they produced nothing.*") (emphasis added).

Here, unlike those cases, the Cherbergs offered evidence that they did respond to Fidelity's two requests for information each time over a period of several months. Thus, a reasonable juror could find that there was no extreme "stonewalling." Further, when viewed in the light most favorable to the Cherbergs as the non-moving party, a reasonable juror could find that they (through their attorney) provided their view of the facts consistently and in a way that explained

why they provided no further information to Fidelity; namely, that "[a]t the time of the [PSA], the Cherbergs were not aware of the previously recorded Easements that were not disclosed in the title report." cf. Tran, 136 Wn.2d at 226 (noting the failure to cooperate including giving "differing stories" to the authorities). Fidelity essentially asks us to "weigh" that evidence and "the likelihood that the evidence will prove true" against the evidence that someone may have told them more details about the Exclusive Easements. Haley, 25 Wn. App. 2d at 217. Such weighing is impermissible at the summary judgment stage.

In sum, we hold there are genuine issues of material fact as to the nature of Cherbergs' knowledge, if any, of the Exclusive Easements and as to whether the Cherbergs substantially complied with Fidelity's investigation. Ranger Ins. Co., 164 Wn.2d at 552. Thus, we are required to reverse the court's order granting Fidelity's motion for summary judgment for this reason alone. Id.

3. Prejudice

Even if arguendo the Cherbergs knew about, and failed to provide, this material information to Fidelity in a way that did not substantially comply with its investigation, Fidelity still carries the burden to put forth "'affirmative proof'" that it was "actually prejudiced by the insured's breach." Tran, 136 Wn.2d at 228-29 (quoting Canron, 82 Wn. App. at 491).

Fidelity argues that "the Cherbergs offered no evidence on the issue of prejudice below" and that "Fidelity's unrebutted deposition testimony established the withheld information negatively impacted Fidelity's investigation, including by influencing its decisions concerning coverage and its actual and potential

20

reservations of rights." In so arguing, Fidelity cites to both deposition testimony and declarations, from their own staff.

In response, the Cherbergs reiterate their arguments that Fidelity had the "same information" they had and failed to diligently investigate their claim.

Our Supreme Court has held that "[p]rejudice is an issue of fact that will seldom be established as a matter of law.'" Staples, 176 Wn.2d at 419 (quoting Tran, 136 Wn.2d at 228). In Tran, our Supreme Court concluded that the insurer had been prejudiced because the insured's failure to cooperate "impeded [the insurer's] ability to investigate the claim" at all. 136 Wn.2d at 231. In Icicle Seafoods, the federal court found prejudice as a matter of law "[w]here an insurer is unable to complete an investigation of facts" at all because of the insured's failure to provide relevant records. 572 F. Supp. 3d at 1064. In contrast, the same federal court found that "[t]here is no *per se* rule that delay of an investigation amounts to prejudice." Corcoran v. Am. Family Mut. Ins. Co. S.I., 634 F. Supp. 3d 1017, 1026 (W.D. Wash. 2022).

Viewing the evidence in the light most favorable to them as the non-moving party, we hold that summary judgment was improper as "reasonable minds could differ" as to whether the Cherbergs' alleged failure to disclose impeded Fidelity's ability to investigate or complete its investigation. Ranger Ins. Co., 164 Wn.2d at 552.

As our Supreme Court has explained, "[b]efore a title company issues a title insurance policy, it must research the state of title to the property in question, which is done using an archive called a tract index or 'title plant.'" Chi. Title Ins. Co., 178

Wn.2d at 125-26. "The Washington Insurance Code requires a title insurance company to own, lease, or maintain a complete set of tract indexes in every county where it transacts business." Id. at 126 (citing RCW 48.29.020(2), .040(1)). Thus, "[t]itle insurance 'characteristically combines search and disclosure with insurance protection in a single operation.'" Campbell v. Ticor Title Ins. Co., 166 Wn.2d 466, 470, 209 P.3d 859 (2009) (quoting Shotwell v. Transamerica Title Ins. Co., 16 Wn. App. 627, 631, 558 P.2d 1359 (1976), aff'd, 91 Wn.2d 161, 588 P.2d 208 (1978)).

A reasonable juror could conclude that the Cherbergs' failure to pass along, e.g., their cryptic handwritten notes of a singular meeting with a real estate agent did nothing to impact that process. Nowhere does Fidelity explain why it failed to research and, as it admitted, to disclose the publicly recorded Exclusive Easements. After all, as this court has observed, "it is reasonable for the insured to believe and rely upon the fact that the insurer has discovered any encumbrances recorded in the public record," independent of any disclosures by the insured. C 1031 Props. Inc., 175 Wn. App. at 32. At most, Fidelity may have established that the Cherbergs' dilatory responses merely delayed its investigation, which does not on its own amount to prejudice," Corcoran, 634 F. Supp. 3d at 1026, let alone constitute one of those rare cases where prejudice is established as a matter of law. Staples, 176 Wn.2d at 419

For these reasons, we reverse the court's order granting Fidelity's motion for summary judgment.

D.    Cherbergs' Motions for Summary Judgment

The Cherbergs moved for summary judgment on their claims of breach of

22

the Policy, bad faith, and violations of IFCA. In short, the merits of these claims ultimately rely in some form on the Cherbergs' knowledge of the Exclusive Easements. As we discussed above, the nature of the Cherbergs' knowledge presents a genuine issue of material fact. In other words, just as a reasonable juror could find that they did not know about the Exclusive Easements, a reasonable juror could find that they did, thus rendering summary judgment improper. Ranger Ins. Co., 164 Wn.2d at 552. We complete our analysis on each claim in turn.

1. Breach of the Policy

The Cherbergs argue Fidelity breached the Policy by both failing to list the Exclusive Easements in the Policy and breaking their promise to indemnify the Cherbergs. Exclusion 3(a) expressly exempts Fidelity from covering "encumbrances" that the insured "assumed or agreed to." Under Exclusion 3(a), the Cherbergs argue they did not accept risk of the Exclusive Easements as they had no knowledge of them or their scope. In response, Fidelity again asserts the Cherbergs knew about the Exclusive Easements and, thus, "assumed or agreed to" them. As discussed above, we hold there is a genuine issue of material fact as to the nature of Cherbergs' pre-closing knowledge of the Exclusive Easements. In turn, there is a genuine issue of material fact as to whether Exception 3(a) relieves Fidelity of liability for declining coverage.[6]

---

[6] This court also has held that "*something more than knowledge* on the part of the insured is necessary to bar coverage" and "that the burden of proof is appropriately with the insurer to establish that the insured agreed to or assumed prior encumbrances." Tumwater State Bank v. Commonwealth Land Title Ins. Co. of Philadelphia, 51 Wn. App. 166, 170, 752 P.2d 930 (1988) (emphasis added); see

2. Bad Faith and IFCA

The Cherbergs also assert that Fidelity acted, as a matter of law, in bad faith in numerous ways. First, they argue Fidelity's withdrawal of coverage under Exclusion 3(a) was untimely as it was approximately two years after the Cherbergs tendered their initial claim. Second, they aver Fidelity relied on "disputed" or "extrinsic" facts to deny coverage. Third, they argue Fidelity withdrew its defense when there was still "conceivable coverage." Fourth, they aver Fidelity relied on an "equivocal" and "self-serving" interpretation of caselaw." Finally, they assert Fidelity breached its written commitment to fund the Cherberg-Griffith litigation.[7]

As to the second argument, the Cherbergs also cite to our Supreme Court's holding that an insurer "must give the insured the benefit of the doubt that the insurer has a duty to defend." (Citing Woo v. Fireman's Fund Ins. Co., 161 Wn.2d 43, 53, 164 P.3d 454 (2007)). Indeed, the "duty to defend generally is determined from the 'eight corners' of the insurance contract and the underlying complaint." Expedia, Inc. v. Steadfast Ins. Co., 180 Wn.2d 793, 803, 329 P.3d 59 (2014). However, there are two exceptions to this rule. Id. First, "if coverage is not clear

_____

also Lawyers Title Ins. Corp. v. Doubletree Partners, L.P., 739 F.3d 848, 867 (5th Cir. 2014). There may also be a genuine issue of material fact as to whether, assuming the Cherbergs knew something about some easement, they also took or did not take additional actions based on that knowledge. We need not fully resolve this issue as there is a genuine issue of material fact as to whether they had the predicate knowledge.

[7] The Cherbergs also argue Fidelity was "obligated" to seek a judicial determination that it had no duty to defend before withdrawing. For this argument, the Cherbergs again rely on Woo v. Fireman's Fund Ins. Co., which states an insurer "*may* . . . seek a declaratory judgment that it has no duty to defend." 161 Wn.2d 43, 54, 164 P.3d 454 (2007) (emphasis added). Thus, Woo merely suggests, but does not require, such a determination.

24

from the face of the complaint but coverage could exist, the insurer must investigate and give the insured the benefit of the doubt on the duty to defend." Id.; Woo, 161 Wn.2d at 53. "Second, if the allegations in the complaint conflict with facts known to the insurer or if the allegations are ambiguous, facts outside the complaint may be considered." Expedia, 180 Wn.2d at 803-804; Woo, 161 Wn.2d at 54. However, the "insurer may not rely on facts extrinsic to the complaint to deny the duty to defend—it may do so only to trigger the duty." Woo, 161 Wn.2d at 54.

In response, Fidelity reiterates its argument that the Cherbergs withheld information revealing their knowledge of, or agreement to, the Exclusive Easements. Further, they argue that the timing of withdrawal was immaterial as it was done after they "first learned of a factual basis upon which it could assert Exclusion 3(a)."

Once again, the resolution of these disputes turns on the nature of Cherbergs' knowledge of the Exclusive Easements. In other words, the Cherbergs' arguments each hinge on whether they knew and withheld information sufficient for Fidelity to invoke Exclusion 3(a). Woo, 161 Wn.2d at 54. The Cherbergs claims of bad faith and unreasonable conduct in Fidelity's timing of that invocation, the withdrawal of coverage, and the scope of the withdrawal all depend on that essential genuine issue of material fact.

As a final note, the Cherbergs state that the "same conduct that establishes Fidelity's bad faith establishes a violation of IFCA." As such, their IFCA claims are

also not proper for summary judgment for the same reasons stated above.[8]

E.      Attorney Fees

        The Cherbergs seek attorney fees under <u>Olympic S.S. Co., Inc. v.</u>

---

[8] We need not reach Fidelity's alternative argument that the court properly denied the Cherbergs' motion for summary judgment on its claims for breach of contract and bad faith for want of proximate cause and cognizable damages. <u>Wash. State Farm Bureau Fed'n v. Gregoire</u>, 162 Wn.2d 284, 307, 174 P.3d 1142 (2007) ("'[p]rinciples of judicial restraint dictate that if resolution of an issue effectively disposes of a case, we should resolve the case on that basis without reaching any other issues that might be presented.'") (quoting <u>Hayden v. Mut. of Enumclaw Ins. Co.</u>, 141 Wn.2d 55, 68, 1 P.3d 1167 (2000)).

To the extent Fidelity's arguments intend to provide an alternative basis vindicating its *own* motion for summary judgment, each of its arguments fails because they (1) are seeking to take advantage of the potentially partial recovery the Cherbergs made in completing the litigation against the Griffiths, where the underlying disputed issue of fact is whether Fidelity may have prematurely abandoned that litigation; (2) posit that diminution in value and other economic losses are not cognizable, without citation to pertinent authority; (3) incorrectly assert (as the trial court did) that the Cherbergs failed to present evidence of damages in compliance with CR 56 by merely reserving on the issue.

As to the final argument, Cherbergs did offer expert testimony on diminution of property value, for example.   And this court has held that "[a] greater degree of certainty is required to prove the *fact* of damages than the *amount* of damages: once it is reasonably certain that the breach caused damages, the fact finder may determine the amount of the damage award by drawing reasonable inferences from reasonably convincing evidence." <u>C 1031 Props., Inc. v. First Am. Title Ins. Co.</u>, 175 Wn. App. 27, 34, 301 P.3d 500 (2013) (alteration in original).  There, this court held reasonable minds could differ on the measure of damages given the "widely divergent measures of damage and First American's lack of opportunity to defend title or reach an accommodation with the power company to bury the power lines" relating to an easement omitted from the title insurance policy.   Similarly, Condition 8 of the Policy broadly states that it "is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured Claimant who has suffered loss or damage by reason of matters insured against by this policy." The Cherbergs have offered sufficient evidence of the *fact* of various forms of monetary damage to survive summary judgment, where the *amount* of such damages (and potential offsets) will be determined by a jury. And the Cherbergs' prayer for relief identifies no non-economic damages.

Centennial Ins. Co., 117 Wn.2d 37, 811 P.2d 673 (1991), and RAP 18.1. "[A]ttorney fees under Olympic Steamship are available to parties prevailing on appeal." Gates v. Homesite Ins. Co., 28 Wn. App. 2d 271, 286, 537 P.3d 1081 (2023).

However, as we have affirmed the denial of the Cherbergs' motion for summary judgment and now remand for further proceedings, we cannot say that they have obtained the full benefits of their insurance contract and deny the fee request as premature. See Robbins v. Mason County Title Ins. Co., 195 Wn.2d 618, 637, 462 P.3d 430 (2020).

III.     CONCLUSION

We reverse the superior court's order granting summary judgment for Fidelity, affirm the court's order denying the Cherbergs' motion for summary judgment, and remand for further proceedings consistent with this opinion.

Díaz, J.

WE CONCUR:

Feldman, J.                          Birk, J.

27